DOUGLAS M. MILLER (Cal. Bar No. 240398)
Email: millerdou@sec.gov
KATHRYN C. WANNER (Cal. Bar No. 269310)
Email: wannerk@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
John W. Berry, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>PETER H. POCKLINGTON, LANTSON E. ELDRED, TERRENCE J. WALTON, YOLANDA C. VELAZQUEZ a/k/a LANA VELAZQUEZ a/k/a LANA PULEO, VANESSA PULEO, ROBERT A. VANETTEN, NOVA OCULUS PARTNERS, LLC, f/k/a THE EYE MACHINE, LLC, and AMC HOLDINGS, LLC,<br><br>Defendants.<br><br>EVA S. POCKLINGTON, DTR HOLDINGS, LLC, COBRA CHEMICAL, LLC, and GOLD STAR RESOURCES, LLC,<br><br>Relief Defendants. | Case No.  5:18-cv-00701-JGB-SP<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO MOTIONS TO DISMISS**<br><br>Date:      Sept. 10, 2017<br>Time:      9:00 a.m.<br>Ctrm:      1<br>Judge:     Hon. Jesus G. Bernal |

# **TABLE OF CONTENTS**

I.  INTRODUCTION ......................................................................................... 1

II.  THE COMPLAINT .................................................................................... 5

    A.  Disciplinary History ......................................................................... 5

    B.  The Formation of Eye Machine ........................................................ 6

    C.  Pocklington's Hidden Control of Eye Machine ............................... 7

    D.  Misappropriation and Misrepresentations Involving Investor Funds .......... 8

III.  ARGUMENT ............................................................................................ 9

    A.  Legal Standard ................................................................................. 9

    B.  The SEC's Scheme to Defraud Claims Allege Conduct Separate and Apart from the Misrepresentation and Omission Claims .......................... 10

    C.  All of the False and Misleading Statements in Claims Four and Five are "Actionable" and Well Pled ........................................................ 13

        1.  Defendants' Statements and Omissions Regarding Offering Costs Were Materially False and Misleading .................................. 13

        2.  The SEC's Allegations that Defendants' Misappropriated Investor Funds are Well Pled ................................................ 16

        3.  The SEC's Allegations that Defendants Concealed Pocklington's Control of Eye Machine are Well Pled ................... 18

    D.  The Complaint Adequately Alleges that Pocklington and Eldred "Made" the Misstatements ................................................................ 20

    E.  The Complaint Alleges with Sufficient Particularity that Walton Negligently Defrauded Investors ..................................................... 23

    F.  The SEC's Aiding and Abetting Claims Should Not Be Dismissed ......... 25

IV.  CONCLUSION......................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Aaron v. SEC,*
    446 U.S. 680 (1980)...................................................................24

*Ackerman v. Schwartz,*
    947 F.2d 841 (7th Cir. 1991) ....................................................19

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).................................................................16

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007).................................................................10

*Carpenters Pension Trust Fund of St. Louis, St. Clair Shores Police & Fire*
    *Retirement System v. Barclays PLC,*
    56 F.Supp.3d 549 (S.D.N.Y. 2014)...........................................21

*City of Pontiac General Employees' Retirement System v. Lockheed Martin*
    *Corp.,*
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) .......................................23

*Dolphin & Bradbury, Inc. v. SEC,*
    512 F.3d 634 (D.D.C. 2008) .....................................................14

*Edwards v. Marin Park, Inc.*
    356 F.3d 1058 (9th Cir. 2004) ..................................................10

*Fecht v. Price Co.,*
    70 F.3d 1078 (9th Cir. 1995) ..............................................14, 18

*Hanon v. Dataproducts Corp.,*
    976 F.2d 497 (9th Cir. 1992) ....................................................19

*Huddleston v. Herman & MacLean,*
    640 F.2d 534 (5th Cir.1981), *rev'd in part on other grounds*, 459 U.S.
    375 (1983)................................................................................15

*In re Boeing Sec. Litig.,*
    40 F.Supp.2d 1160 (W.D. Wash. 1998) ....................................14

*In re Fannie Mae 2008 Sec. Litig.,*
    891 F.Supp.2d 458 (S.D.N.Y. Aug. 30, 2012) ..........................21

*In re Merck & Co., Inc. Securities, Derivative, & ERISA Litigation,*
    No. 11-cv-1658 (SRC), 2011 WL 3444199 (D. NJ Aug. 8, 2011) ..................21

*In re Pfizer Inc. Securities Litigation,*
    Nos. 04-cv-9866(LTS)(HBP), 05-MD-1688(LTS), 2012 WL 983548
    (S.D.N.Y. Mar. 22, 2012)...........................................21, 22, 23

*In re Prudential Sec. Inc. Ltd. Partnership Litig.,*
    930 F. Supp. 68 (S.D.N.Y. 1996) .................................................. 14, 15

*In re Smith Barney Transfer Agent Litig.,*
    884 F.Supp.2d 152 (S.D.N.Y. 2012) ................................................ 12

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.,*
    MDL No. 2672 CRB (JSC), 2017 WL 3058563 (N.D. Cal. July 19, 2017) ................................................................................ 22

*In re Worlds of Wonder Sec. Litig.,*
    35 F.3d 1407 (9th Cir. 1994) .................................................. 14

*Janus Capital Group, Inc. v. First Derivative Traders,*
    131 S. Ct. 2296 (2011) .................................................. 20

*Lentell v. Merrill Lynch & Co,*
    396 F.3d 161 (2d Cir. 2005) .................................................. 11

*Moyo v. Gomez*
    32 F.3d 1382 (1994) .................................................. 10

*Oaktree Principal Fund V, LP v. Warburg Pincus LLC,*
    No. 15-cv-8574, 2016 WL 6782768 (C.D. Cal. Aug. 9, 2016) ................ 23

*Reese v. BP Exploration (Alaska) Inc.,*
    643 F.3d 681 (9th Cir. 2011) .................................................. 22

*SEC  v. Mercury Interactive,* LLC,
    2011 WL 5871020 (N.D. Cal. Nov. 22, 2011) .......................... 20, 22

*SEC v. Aequitas Mgmt., LLC.,*
    No. 3:16-cv-438-PK, 2017 WL 1206691 (D. Or. 2017) .................... 12

*SEC v. AgFeed Industries, Inc.,*
    No. 3:14-cv-00663, 2016 WL 10934942, (M.D. Tenn. 2016) ............ 12

*SEC v. Bardman,*
    216 F. Supp. 3d 1041 (N.D. Cal. 2016) .............................. 12, 17, 18

*SEC v. Benger,*
    931 F. Supp. 2d 904 (N.D. Ill. 2013) .................................. 21

*SEC v. Blavin,*
    760 F.2d 706 (6th Cir. 1985) .................................................. 14

*SEC v. City of Victorville*
    ED CV13-00776 JAK (DTBx), 2012 U.S. Dist. Lexis 164530 (C.D. Cal. Nov. 14, 2013) .................................................. 20

*SEC v. Daifotis,*
    2011 WL 3295139 (N.D. Cal. Aug. 1, 2011) .................................. 21

*SEC v. Fehn,*
    97 F.3d 1276 (9th Cir. 1996) .................................................. 19

*SEC v. Gallard*,
    No. 95 Civ. 3099 (HB), 1997 WL 767570 (S.D.N.Y. Dec. 10, 1997)..............18

*SEC v. Hughes Capital Corp.*,
    124 F.3d 449 (3d Cir. 1997) .........................................................................24

*SEC v. Jammin Java Corp.*,
    Case No. 2:15-cv-08921-SVW-MRW, 2016 WL 6595133 (C.D. Cal. Jul.
    18, 2016) .......................................................................................................18

*SEC v. JB Oxford Holdings, Inc.*
    2004 WL 6234910 (C.D. Cal., Nov. 9, 2004) ...........................................10, 15

*SEC v. Medical Capital Holdings, Inc.*,
    No. SACV 09–0818 DOC (RNBx), 2010 WL 809406 (C.D. Cal. Feb.
    24, 2010) .......................................................................................................20

*SEC v. Mozilo*,
    2009 WL 3807124 ..........................................................................................18

*SEC v. Mudd*,
    885 F. Supp. 2d 654 (S.D.N.Y. 2012) ...........................................................17

*SEC v. One or More Unknown Traders in the Sec. of Onyx Pharm., Inc.*
    296 F.R.D. 241 (S.D.N.Y. 2013)...................................................................16

*SEC v. Rana Research, Inc.*,
    8 F.3d 1358 (9th Cir. 1993 ......................................................................14, 20

*SEC v. Research Automation Corp.*,
    585 F.2d 31 (2d Cir. 1978) ............................................................................18

*SEC v. Richie*,
    No. EDCV -6-63-VPA SGLX, 2008 WL 2938678  (C.D. Cal. May 9,
    2008) 15

*SEC v. TLC Invs. and Trade Co.*,
    179 F. Supp. 2d 1149 (C.D. Cal. 2001) .........................................................18

*SEC v. Trabulse*,
    526 F. Supp. 2d 1001 (N.D. Cal. 2007)..........................................................20

*SEC v. Wilde*,
    No. SACV 11-0315 DOC (AJWx), 2012 WL 6621747 (C.D. Cal. Dec.
    17, 2012) ...................................................................................................12, 18

*SEC v. Zandford*,
    535 U.S. 813 (2002)........................................................................................12

*SEC v. Zouvas*,
    No. 3:16-cv-0998-CAB-(DHB), 2016 WL 6834028 (S.D. Cal. Nov. 21,
    2016) .......................................................................................................17, 18

*SEC v. Zwebner*,
    No. 3:16-cv-01013-CAB(DHB), 2016 WL 9526398 (S.D. Cal. 2016) ...........12

*Sowinski v. California Air Resources Board*,
   720 Fed. Appx. 615 (9th Cir. Dec. 18, 2017).....................................2

*Swartz v. KPMG LLP*
   476 F.3d 756 (9th Cir. 2007) ...............................................10

*Touchtone Grp. v. Rink*,
   No. 11-cv-02971, 2012 WL 6652850 (D. Colo. Dec. 21, 2012)......21

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)...........................................................20

*United States v. Ellison*,
   704 Fed. Appx. 616 (9th Cir. 2017) ....................................12

*Weiss v. SEC*,
   468 F.3d 849 (D.C. Cir. 2006).............................................25

*Wool v. Tandem Computers Inc.*
   818 F.2d 1433 (9th Cir. 1987) ............................................10

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
   655 F.3d 1039 (9th Cir. 2011) ............................................11

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ..............................................17

**Securities Act of 1933**

Section 17(a)(1)
   [15 U.S.C. §77q(a)(1)]........................................................10

Section 17(a)(2)
   [15 U.S.C. §77q(a)(2)].................................................10, 11

Section 17(a)(3)
   [15 U.S.C. §77q(a)(3)]........................................................10

**FEDERAL REGULATIONS**

Rule 10b-5(a)
   [17 C.F.R. 240.10b-5(a)] .............................................10, 11

Rule 10b-5(b)
   [17 C.F.R. 240.10b-5(b)] .............................................10, 11

Rule 10b-5(c)
   [17 C.F.R. 240.10b-5(c)] .............................................10, 11

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 8(a)(2)............................................................10

Fed. R. Civ. P. 9(b) ...............................................................10

Fed. R. Civ. P. 12(b)(6)............................................................9

1

## I.    INTRODUCTION

2        On April 5, 2018, Plaintiff Securities and Exchange Commission ("SEC") filed

3   its complaint against defendant Novo Oculus Partners, LLC, formerly the Eye

4   Machine, LLC ("Eye Machine"), a company ostensibly created to develop a medical

5   device to treat macular degeneration.  (Dkt. No. 1.)  The SEC's complaint also names

6   two of Eye Machine's principals, Peter H. Pocklington and Lantson Eldred; its chief

7   financial officer and accountant, Terrence J. Walton; three of its sales agents,

8   Yolanda C. Velazquez, Vanessa Puleo, and Robert Vanetten; and its holding

9   company, AMC Holdings, LLC ("AMC").[1]  (Id.)  The complaint alleges, in

10  substance, that between 2014 and 2017 defendants raised over $14 million from more

11  than 260 investors and, in the process, misappropriated investor funds and made false

12  and misleading statements to investors about who would be running the company and

13  how investor proceeds would be spent.  (Id. ¶¶ 4-9.)  The complaint further alleges

14  that Eye Machine's securities and the defendants who sold them were not properly

15  registered with the SEC.  (Id.)

16        Defendants Eye Machine, Pocklington, Eldred, Walton, Vanetten, and AMC

17  ("defendants") now seek the dismissal of the first six claims of the SEC's complaint –

18  though not the claims alleging a failure to properly register with the SEC.[2]  (Dkt. Nos.

19  27 and 29.)  They do so, even though their counsel failed to comply with Local Rule

20  7-3, requiring that they meet and confer with opposing counsel *before* filing their

21  motions.[3]  Counsel were clearly in a rush to get their motions on file, because they

22

23  [1] The complaint also names Pocklington's wife, Eva S. Pocklington, and several
    entities, including DTR Holdings, LLC ("DTR"), Cobra Chemical, LLC ("Cobra"),
24  and Gold Star Resources, LLC ("Gold Star"), as relief defendants.

25  [2]  Defendant Eldred's counsel joined in this motion, but also raises arguments of his
    own.  (Dkt. No. 29.)  This opposition addresses both motions.  Defendants Velazquez
26  and Puleo have not joined in this motion.  The Court recently approved a stipulation
    extending their time to file an answer to the complaint until August 20, 2018.  (Dkt.
27  No. 35.)

28  [3] One counsel suggests that the Court should overlook their failure to comply with the
    Local Rules, since it was inadvertent and it was "highly unlikely the parties [would]

ignore several of the allegations in the complaint and make arguments that overlook established precedent.  First, they argue that the scheme to defraud claims (Claims One and Two) should be dismissed because in order to support those claims the SEC relies on the "very same" misrepresentations and omissions it alleges in the scheme to defraud claims (Claims Four and Five).  (Dkt. No. 27, pp. 12-16.)  Defendants argue that this runs afoul of Ninth Circuit precedent and other court rulings, which they say "have made clear that alleged misrepresentations and omissions are chargeable *only* under Rule 10b-5(b) and are insufficient to establish a fraudulent scheme under Rule 10b-5(a) and (c)."  (*Id.* at 13.) (emphasis added.)

Next, defendants argue that Claims Four and Five should also be dismissed because the misstatements and omissions they allege are not "actionable."  (*Id.* at 18.)  For example, defendants claim that any misstatements made to investors about how much money Eye Machine would spend on offering costs are not actionable because the private placement memoranda ("PPMs") explicitly told investors that offering costs "may be higher than expected" and "may differ substantially" than what was set forth in the PPMs.  (*Id.* at 18-21.)  Defendants argue that this sort of language in the PPMs "bespoke caution," negating any inference defendants acted with scienter and making their misstatements immaterial.  (*Id.* at 21.)  Defendants also accuse the SEC of making "conclusory" allegations about the materiality of the misstatements in the PPMs, and of failing to adequately allege defendants acted with scienter. (*Id.* at 27.)

Defendants Pocklington and Eldred make separate arguments against Claims Four and Five, arguing that the complaint fails to adequately allege they were the

---

reach a resolution through the meet-and-confer process." (Dkt. No. 27, p. 2 n.1.)  The other offers the Court no explanation.  As the Ninth Circuit recently observed, judges in the Central District of California have in a number of cases insisted on strict adherence to the Local Rules and have dismissed and denied motions for these sorts of violations.  *See Sowinski v. California Air Resources Board*, 720 Fed. Appx. 615, 618 (9th Cir. Dec. 18, 2017) (upholding district court's denial of motion for reconsideration on the basis that motion did not contain the required statement confirming that a meet-and-confer had taken place).

Case No. 5:18-cv-00701-JGB-SP

1   "makers" of the misstatements contained in the PPMs or that they had "ultimate

2   authority" over them.  (Dkt. No. 27, pp. 28-30; Dkt. No. 29, pp. 3-5.)  Defendant

3   Pocklington argues that "helping" draft the PPMs and "reviewing" them before they

4   went to investors is insufficient.  (Dkt. No. 27, p. 29.)  According to Pocklington, the

5   SEC must specifically allege that he had "ultimate authority" over the misstatements

6   and the "discretion to change the content."  (*Id.* at 30.)  Defendant Eldred, on the

7   other hand, argues that it is the specificity of the SEC's complaint that warrants

8   dismissal.  (Dkt. 29, pp. 3-5.)  He claims that because the SEC's complaint so clearly

9   alleges that he was a "visual front" for the Eye Machine and was not the person who

10  had "control" and "ultimate decision-making authority" over the company, the SEC

11  cannot simultaneously claim that it was he who "made" the statements in the PPMs.

12  (*Id.* at 4-5.)

13        Defendant Walton, the only defendant named in Claim Three, argues that the

14  claim against him must be dismissed because it fails to allege with particularity the

15  way in which he negligently defrauded investors.  (*Id.* at 30.)   He claims that it is not

16  enough for the SEC to allege he took "no steps" to determine whether payments out

17  of investor funds were proper or that he failed to read portions of the PPM that

18  explained how investor proceeds should be spent.  (*Id.*)  Walton argues that the SEC

19  must specifically allege the standard of care applicable to his conduct and explain

20  why, as Eye Machine's accountant, his conduct fell below that standard.  (*Id.* at 31.)

21        Finally, defendants Pocklington and Eldred argue that Claim Six, which alleges

22  they aided and abetted Eye Machine's securities fraud violations, should be dismissed

23  because the SEC cannot make out a primary violation against Eye Machine for

24  violating Section 10(b) or Section 17(a).  (Dkt. No. 27, pp. 31-32; Dkt. No. 29, p. 5.)

25  In other words, because the primary violations against Eye Machine purportedly fail,

26  the claim that Pocklington and Eldred aided and abetted those primary violations

27  should "necessarily fail as well."  (Dkt. No. 29, p. 5.)

28        All of defendants' asserted grounds for dismissal lack any merit, and should be

3

entirely rejected.  To start, Claims One and Two should not be dismissed because the Ninth Circuit has never held that "misrepresentations and omissions are chargeable *only* under Rule 10b-5(b) and are insufficient to establish a fraudulent scheme under Rule 10b-5(a) and (c)."  It instead held that misrepresentations and omissions cannot be the sole basis for scheme to defraud claims, and here the complaint alleges "several deceptive *acts beyond* what was written in the PPMs" to support its Rule 10b-5(a) and (c) claims.  (Dkt. No. 1 ¶ 66.)  Claims Four and Five should not be dismissed under the bespeaks caution doctrine because it does not apply to SEC enforcement actions.  Even if it did, it would not protect defendants, who knew the cautionary language used in the PPMs was false and inadequate, and did not warn investors of risks they knew existed.

Defendants' argument that the allegations in the complaint relating to scienter are "conclusory" should fail, because it ignores a long line of cases holding that, unlike private litigants, the SEC may allege the scienter element of a securities fraud claim generally.  The same is true for defendants' argument relating to the materiality of the misstatements.  Defendants overlook the fact that many of those misstatements have been deemed material as a matter of law and those that have not been will be for the jury to decide.  It is not something for the Court to decide at this stage.

As for Pocklington's and Eldred's argument that, under *Janus*, the complaint fails to adequately allege they "made" the misstatements under Section 17(a)(2), several courts have held that *Janus* does not apply to Section 17(a)(2) claims.  And although *Janus* does apply to Section 10b-5(b) claims, nothing in *Janus* altered the well-established rule that an entity can act only through its employees and agents, as the complaint alleges happened here.  Thus, alleging that Pocklington helped draft the PPMs and reviewed them before they went to investors suffices.  Eldred also misinterprets *Janus* because it does not prevent officers who work together in the same company, like he and Pocklington did, from being held jointly responsible for misstatements on a theory of primary liability.  Finally, Walton's argument that the

SEC must allege a standard of care beyond mere negligence and explain why, as the accountant for Eye Machine, his conduct fell below that standard has no merit. Section 17(a)(3) only requires the SEC to allege that Walton acted negligently and failed to exercise reasonable care.  The SEC has done so.   The Court should not require the specialized or subjective standard of care like the one Walton seeks.

 For these reasons, defendants' motion to dismiss should be denied.

## II. <u>THE COMPLAINT</u>

 The SEC's complaint begins with a summary of the fraud that defendants committed.  (Dkt. No. 1, ¶ 4.)  It explains that from 2014 until at least 2017, defendants raised over $14 million from more than 260 investors and, in the process, concealed the true identity of the person at the helm of the company (Pocklington), misappropriated investor funds, and paid excessive commissions to their sales agents. (*Id.*)  It describes Eye Machine and its founder, Pocklington, with assistance from Eldred, as the ones "at the heart" of the fraud and provides a summary of their conduct.  (*Id.* at ¶ 5.)  For example, it alleges that Pocklington and Eldred were the ones who prevented investors from learning that Pocklington, a convicted felon and someone who had been previously sanctioned for securities fraud, was actually in control of Eye Machine.  (*Id.*)  It further alleges that Pocklington and Eldred "made false and misleading statements to investors" about the extent to which investor proceeds would be used for offering costs and "defrauded" investors by siphoning off approximately $681,587 of investor funds.  (*Id.* ¶ 8.)  The complaint then briefly summarizes the conduct of the other defendants.  (*Id.* ¶¶ 7-9.)

### A. Disciplinary History

 After summarizing defendants' conduct and the securities laws they are alleged to have violated, the complaint provides a description of defendants and several of the criminal and regulatory acts that Pocklington and Velazquez committed before Eye Machine began offering its securities.  (*Id.* ¶¶ 12-19, 24-36.)  With respect to Pocklington, it explains that in May 2010 he pleaded guilty to felony perjury and was

later sentenced to two years of probation.  (*Id.* ¶¶ 24-27.)  Three years later, in May 2013, Pocklington consented to a cease and desist order issued by the Arizona Corporation Commission.  (*Id.* ¶ 28.)  The order found that Pocklington had engaged in, among other things, state securities fraud by misleading investors in connection with two gold mining companies.  (*Id.* ¶¶ 28-30.)

With respect to Velazquez, the complaint describes how in February 2005 she consented to the entry of a final judgment in an SEC enforcement action filed in the Southern District of Florida.  (*Id.* ¶ 32.)  According to the complaint, Velazquez failed to disclose the amount of compensation she received for promoting an investment, and otherwise engaged in conduct that operated as a fraud and deceit on investors.  (*Id.* ¶ 33.)  She was later barred by the SEC from associating with any broker-dealer.  (*Id.* ¶ 34.)  Four years later, the SEC sued Velazquez a second time, this time in the Southern District of Indiana.  (*Id.* ¶ 35.)  Velazquez once again consented to the entry of a final judgment against her. (*Id.* ¶ 35-36.)   The complaint explains that these prior violations committed by Pocklington and Velazquez disqualified Eye Machine's offering from claiming any exemption from SEC registration requirements pursuant to Rule 506(c) under Regulation D.  (*Id.* ¶¶ 104-110.)

**B.     The Formation of Eye Machine**

The complaint describes how less than a year after the Arizona Corporation Commission entered the $5 million restitution order against him, Pocklington created Eye Machine.  (*Id.* ¶ 37.)  From the outset "Pocklington controlled Eye Machine," but he directed Eldred to make AMC the majority shareholder of Eye Machine and had his wife, relief defendant Eva S. Pocklington, become the owner of AMC, while Eldred served as the manager of AMC.  (*Id.* ¶ 39.)  Between April 2014 and May 2017, Eye Machine raised at least $14 million from over 260 investors in several states. (*Id.* ¶ 41.)  The complaint alleges that investors were solicited using six different PPMs that "Pocklington and Eldred each helped draft," including "providing

the factual information contained in the PPMs, and by reviewing the PPMs before they were provided to investors."  (*Id.* ¶¶ 46-47.)

### C.    Pocklington's Hidden Control of Eye Machine

The complaint explains how Eye Machine, AMC, Pocklington, and Eldred each took several steps to conceal Pocklington's control of Eye Machine and to cover up his checkered past.  (*Id.* ¶ 51.)  This included making misstatements *and* engaging in deceptive conduct.  (*Id.*)  The complaint explains the "false and misleading statements" about who controlled Eye Machine and who managed its day-to-day operations.  (*Id.* ¶ 52.)  For example, the PPMs stated that Eldred would have "full, exclusive and complete authority and discretion" in the management of Eye Machine.  (*Id.*)  The complaint gives several examples of how this statement was "misleading" and how Pocklington "was the one who actually controlled Eye Machine."  (*Id.* ¶ 55.)  One example explains how Pocklington actually admitted he was the one who made the "big picture decisions" for the company, whereas Eldred was just the "visual front" for the company.  (*Id.* ¶ 57.)  The complaint alleges that Pocklington's control over Eye Machine was understood by those working at the company, yet Pocklington's name "appeared nowhere in the first five Eye Machine PPMs" provided to investors.  (*Id.* ¶¶ 56, 59.)  The complaint alleges that concealing Pocklington's role at Eye Machine was a "material" fact that investors would have found important in making their investment decisions.  (*Id.* ¶ 61.)

After explaining the "false and misleading statements" in the PPMs, the complaint goes on to describe the "several deceptive acts beyond what was written in the PPMs" that were taken by Eldred and Pocklington to hide who really controlled the company.  (*Id.* ¶ 66.)  This included creating AMC to conceal Pocklington's *de facto* control over Eye Machine, concealing Pocklington's full identity during investor calls, and submitting several Notices of Exempt Offering (Forms D) to the SEC, which falsely indicated there were no "bad actors" like Pocklington participating in Eye Machine's offering.  (*Id.* ¶¶ 66-77.)  The complaint describes

these deceptive acts as concealing "material" facts that investors would have found important.  (*Id.* ¶ 77.)

### D.    Misappropriation and Misrepresentations Involving Investor Funds

The complaint closes out its description of the fraud by explaining how Eye Machine, Pocklington, and Eldred made "misleading statements in the PPMs about how investor money would be spent" and "misappropriated investor funds."  (*Id.* ¶ 78.)  For the misleading statements, the complaint describes how the PPMs claimed that only approximately 28 percent of the gross offering proceeds were "expected" to be used to pay the offering costs, including commissions, accounting, legal, and printing expenses.  (*Id.* ¶ 79.)  The complaint alleges this statement was false and misleading, because at the exact time the statement was being made to investors, approximately 39 percent of the gross offering proceeds were actually being spent to pay "sales commissions alone" and the bulk of those commissions were going to defendants Velazquez and Puleo, who received a commission of approximately 42 percent.

The complaint points out that although the "Risk Factors" section in the PPMs warned that these costs "may be higher than expected" and "could range up to 50% of the capital raised," they failed to disclose that defendants already knew offering costs would be consistently higher than the "expected" 28 percent.  To illustrate this point, the complaint describes how, over the course of six private offerings, approximately 40 percent of investor funds went to offering costs.  (*Id.* ¶ 83.)  The complaint also describes how Pocklington hired Velazquez in June 2014, during the *very first* private offering, and told her then that "she would be the primary person selling units for Eye Machine and that she would 'always' be paid a 42.5% commission."  (*Id.* ¶ 84.)  As for Eldred, the complaint describes how Pocklington and Eldred regularly reviewed Eye Machine's bank accounts, which showed that approximately 42.5% of investor funds (or nearly $5 million of the $14 million total investor funds raised) went to commissions.  (*Id.* ¶¶ 81, 85-86.)

1    The PPMs also claimed that the "net proceeds" of investor funds would be
2    used towards the development of Eye Machine, such as paying for the costs of
3    preparing and processing an application to the FDA for approval of the eye machine
4    as a medical device. (*Id.* ¶ 88.) The complaint alleges that, in reality, defendants Eye
5    Machine, AMC, Pocklington, Eldred, and Walton "misappropriated approximately
6    $681,587 of investor funds from Eye Machine's bank account." (*Id.* ¶ 89.) Using a
7    chart, the complaint describes in detail what the misappropriated funds were used to
8    purchase, including $127,771 in cash payments to Pocklington's wife, relief
9    defendant Eva S. Pocklington, and $90,863 in payments towards her personal credit
10   card. (*Id.*) The complaint alleges that Eye Machine investors "were not aware" their
11   funds were being used for these "undisclosed purposes" and that a reasonable
12   investor would have found it "important to their investment decision." (*Id.* at 92.)

13   The complaint alleges that the misrepresentations and omissions in the PPMs
14   were "made" by Pocklington, Eldred, and Eye Machine, and that they knew or were
15   reckless in not knowing of the misrepresentations in the PPMs. (*Id.* ¶ 95.) The
16   complaint also alleges that Pocklington, Eldred, and Eye Machine knew or were
17   reckless in not knowing that investor funds were being misappropriated and misused.
18   (*Id.*) The complaint alleges that Walton acted negligently and failed to exercise
19   reasonable care in discharging his own responsibilities to investors. (*Id.* ¶ 99.) This
20   included taking "no steps" to determine whether the expenditures were permitted
21   under the PPMs and never reading the portions of the PPMs that explained how
22   investor proceedings should be spent, particularly in light of Walton's background as
23   a certified public accountant. (*Id.*)

24   **III.   ARGUMENT**

25   **A.   Legal Standard**

26   When evaluating a motion to dismiss under Federal Rule of Civil Procedure
27   12(b)(6), the Court must accept as true all allegations of material facts that are in the
28   complaint and must construe all inferences in the light most favorable to the non-

1    moving party.  *Moyo v. Gomez*, 32 F.3d 1382, 1384 (1994).  Dismissal of a complaint

2    for failure to state a claim is not proper where a plaintiff has alleged "enough facts to

3    state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550

4    U.S. 544, 570 (2007).  Rule 12(b)(6) is read in conjunction with Rule 8(a), which

5    requires only a short and plain statement of the claim showing that the pleader is

6    entitled to relief.  Fed. R. Civ. P. 8(a)(2).  "However, where a complaint includes

7    allegations of fraud, Federal Rule of Civil Procedure 9(b) requires more specificity

8    including an account of the 'time, place, and specific content of the false

9    representations as well as the identities of the parties to the misrepresentations.' "

10   *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Edwards v. Marin*

11   *Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)).  "A pleading is sufficient under

12   [R]ule 9(b) if it identifies the circumstances constituting fraud so that a defendant can

13   prepare an adequate answer from the allegations."  *SEC v. JB Oxford Holdings, Inc.*,

14   No. CV 04-07084 PA (VBKx), 2004 WL 6234910, at *3 (C.D. Cal., Nov. 9, 2004)

15   (quoting *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987)).

### B. The SEC's Scheme to Defraud Claims Allege Conduct Separate and Apart from the Misrepresentation and Omission Claims

16   Defendants first attack Claims One and Two of the SEC's complaint, arguing

17   that they should be dismissed because they fail to adequately plead a scheme to

18   defraud under Rule 10b-5(a) and (c) and Section 17(a)(1) and (3).  (Dkt. No. 27, pp.

19   12-16.)  To do this, defendants misstate the law and the facts.  Defendants claim the

20   allegations are inadequate because they rely on "the very same misrepresentations

21   and omissions" that the SEC uses to support its 10b-5(b) and Section 17(a)(2) claims

22   (Claims Four and Five).  (*Id.* at 15.)  This, they claim, runs afoul of Ninth Circuit

23   precedent and other court rulings, which they say "have made clear that alleged

24   misrepresentations and omissions are chargeable *only* under Rule 10b-5(b) and are

25   insufficient to establish a fraudulent scheme under Rule 10b-5(a) and (c)."  (*Id.* at

26   13.) (emphasis added)

27

28

1    The Ninth Circuit has never held that misrepresentations and omissions are

2  *only* chargeable under Rule 10b-5(b) and 17(a)(2).  What the Ninth Circuit held in

3  *WPP Luxembourg* is that "[a] defendant may only be liable as part of a fraudulent

4  scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c)

5  when the scheme *also* encompasses conduct beyond those misrepresentations or

6  omissions."  *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d

7  1039, 1057 (9th Cir. 2011).  In other words, misrepresentations and omissions can be

8  charged as part of a fraudulent scheme so long as they are not the "sole" allegations

9  used to support that scheme.  *See Lentell v. Merrill Lynch & Co*, 396 F.3d 161, 177

10  (2d Cir. 2005) ("[W]here the *sole* basis for such claims is alleged misrepresentations

11  or omissions, plaintiffs have not made out a market manipulation claim under Rule

12  10b-5(a) and (c).").

13    Defendants misstate the facts when they say that the scheme claims are based

14  on the "very same" allegations as misrepresentation claims.  As explained above, the

15  SEC's complaint makes clear that defendants' conduct included both making false

16  statements *and* engaging in deceptive conduct.  (Dkt. No. 1 ¶¶ 51, 66, 78, 89.)  It

17  explicitly states that "Pocklington and Eldred engaged in several deceptive acts

18  *beyond* what was written in the PPMs."  (*Id.* ¶ 66.) (emphasis added.)  For example,

19  the SEC alleges that Pocklington and Eldred: (1) formed AMC to conceal

20  Pocklington's *de facto* control over Eye Machine; (2) concealed Pocklington's full

21  identity during conference calls with investors; (3) concealed Pocklington's

22  management and control of Eye Machine from their outside counsel; (4) submitted a

23  false declaration in a state court filing; (5) and falsified forms submitted to the SEC in

24  order to conceal Pocklington's involvement in Eye Machine.  (Dkt. No. 1 ¶¶ 66-77.)

25    Defendants assert that this is not enough and that the SEC must allege an

26  "independent" or "broader scheme" to satisfy the pleading requirements for a scheme

27  to defraud.  (Dkt. No. 27, pp. 15-16.)  But several courts, including the Ninth Circuit,

28  have held that these types of allegations satisfy *WPP Luxembourg* and can be used to

1  support a scheme to defraud claim.  *See United States v. Ellison*, 704 Fed. Appx. 616,
2  622 (9th Cir. 2017) (finding sufficient evidence of scheme liability separate from
3  misrepresentations where defendant withheld information and prevented greater
4  transparency); *SEC v. Bardman*, 216 F. Supp. 3d 1041, 1057 (N.D. Cal. 2016)
5  (finding complaint adequately alleged scheme to defraud where it alleged defendant
6  had inherently deceptive discussions with auditor); *SEC v. Zwebner,* No. 3:16-cv-
7  01013-CAB(DHB), 2016 WL 9526398, * 4 (S.D. Cal. 2016) (finding allegations
8  went beyond misstatements and omissions because the SEC alleged defendant filed
9  false registration statements and submitted false information to FINRA); *SEC v.
10  AgFeed Industries, Inc.,* No. 3:14-cv-00663, 2016 WL 10934942, *15 (M.D. Tenn.
11  2016) (finding allegations supported scheme liability where the SEC alleged
12  defendants concealed fraud and lied to outside advisors).
13          The scheme to defraud claim is further supported by the allegations that
14  defendants misappropriated approximately $681,587 of investor funds.  (Dkt. No. 1 ¶
15  89.)  The misappropriation of funds is the hallmark of a scheme to defraud.  *See, e.g.*,
16  *SEC v. Zandford*, 535 U.S. 813, 820-21 (2002); *SEC v. Aequitas Mgmt., LLC.,* No.
17  3:16-cv-438-PK, 2017 WL 1206691, *13 (D. Or. 2017) (scheme to defraud claim
18  went beyond misstatements and omissions where SEC alleged defendant used
19  investor funds to make Ponzi payments); *SEC v. Wilde*, No. SACV 11-0315 DOC
20  (AJWx), 2012 WL 6621747, *5 (C.D. Cal. Dec. 17, 2012) (finding defendants
21  violated Sections 17(a) and 10(b) by misappropriating investors' money); *In re Smith
22  Barney Transfer Agent Litig.*, 884 F.Supp.2d 152, 161 (S.D.N.Y. 2012) (sustaining a
23  scheme liability claim where plaintiff alleged that defendants not only misleadingly
24  disclosed fees but also channeled cost savings away from the mutual fund to which
25  they properly belonged).  For all these reasons, the Court should reject defendants'
26  argument that the SEC's complaint fails to adequately allege a scheme to defraud in
27  Claims One and Two.
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.    All of the False and Misleading Statements in Claims Four and Five are "Actionable" and Well Pled**

**1.    Defendants' Statements and Omissions Regarding Offering Costs Were Materially False and Misleading**

Defendants argue that Claims Four and Five of the SEC's complaint should be dismissed because the allegations pertaining to those claims – particularly those having to do with 28 percent of investor proceeds being used towards offering costs – are not "actionable." (Dkt. No. 27, pp. 18-22.)  According to defendants, they "fail to allege any falsity" and were immaterial to investors.  (*Id.*)  Defendants accuse the SEC of misrepresenting these disclosures in order to "create the appearance of falsity."  (*Id.* at 18.)  They point to the fact that the PPMs disclosed that offering costs "may be higher than expected" and "could range up to 50% of the capital raised." (*Id.* at 19.)  They claim that these disclosures triggered the "bespeaks caution" doctrine, which they say provides that forward looking statements are immaterial, as a matter of law, when they contain enough cautionary language to adequately notify investors of the risks involved.  (*Id.* at 20-21.)  The Court should reject all of these arguments.

To start, the SEC did not misrepresent anything in its complaint.  What the complaint alleges is that "[t]he PPMs claimed, *in substance*, that only approximately 28% of the gross offering proceeds were '*expected*' to be used to pay all of the offering costs for the offerings."  (Dkt. No. 1 ¶ 79.) (emphasis added.)  This in no way misrepresents what the PPMs said ("An amount equal to 28% of the gross proceeds of the offering has been set aside to pay estimated" offering costs).  (Dkt. No. 27, Ex. 1, p. 20.)  Moreover, the complaint points out that the PPMs contained "Risk Factors," or warnings that these costs "may be higher than expected" and "could range up to 50% of the capital raised."  (Dkt. No. 1 ¶ 83.)

However, defendants' argument that this cautionary language somehow negates their scienter and the materiality of their misstatements is baseless.  The

bespeaks caution doctrine should not even be applied to SEC enforcement actions.  It is premised on an investor's reasonable "reliance" on the cautionary language and is designed "to minimize the chance that a plaintiff with a largely groundless claim will bring a suit and conduct extensive discovery in the hopes of obtaining an increased settlement."  *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414-15 (9th Cir. 1994).  Neither of these considerations is relevant here.  The SEC only seeks equitable relief in its actions and is under no obligation to prove reliance in order for defendants to be found liable.  *See SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993).  For these reasons, the "bespeaks caution" doctrine should have no bearing here.  *See SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985) (rejecting defendant's argument that cautionary language shielded him from liability for misstatements because SEC does not have to prove reliance).

Even if the Court were to apply this doctrine, it would have to do so "narrowly" and with "significant limitations."  *In re Worlds of Wonder Sec. Litig.*, 35 F.3d at 1414-15 (pointing out district court's narrow application of the doctrine); *In re Prudential Sec. Inc. Ltd. Partnership Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996); *In re Boeing Sec. Litig.*, 40 F.Supp.2d 1160, 1170 (W.D. Wash. 1998) (doctrine is "applied narrowly").  One limitation is that "cautionary language does not protect material misrepresentations or omissions when defendants knew they were false when made."  *In re Prudential*, 930 F.Supp. at 72; *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.D.C. 2008) (defendant's "cautionary language only disclosed a risk that tenants might leave [office]—not his knowledge that [a tenant] actually planned to do so in the near future").  Another is that the alleged misstatements must be accompanied by "'enough cautionary language or risk disclosure,' that 'reasonable minds' could not disagree that the challenged statements were not misleading."  *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995) (quoting *In re Worlds of Wonder*, 35 F.3d at 1413).  In short, the doctrine "provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead

1  when he knows with near certainty that the Grand Canyon lies one foot away." *In re*

2  *Prudential*, 930 F. Supp. at 72; *Huddleston v. Herman & MacLean*, 640 F.2d 534,

3  544 (5th Cir.1981), *rev'd in part on other grounds*, 459 U.S. 375 (1983).

4       These limitations would render the bespeaks caution doctrine inapplicable here

5  because – as the complaint alleges – defendants knew, in advance, that the offering

6  costs would exceed the 28 percent they "expected" in the PPMs.  For instance,

7  although the "Risk Factors" in the PPMs stated that the offering costs "may be higher

8  than expected," defendants knew the offering costs were, in fact, consistently higher

9  than 28 percent.  (Dkt. No. 1 ¶ 83.)  This was evident in the first six private offerings,

10  where approximately 40.72 percent of investor funds (not 28 percent) went to

11  offering costs.  (*Id.*)

12       The complaint alleges that defendants should have disclosed these offering

13  costs in the PPMs because Pocklington arranged for Eye Machine to hire Velazquez

14  in June 2014, during the *very first* private offering, and he told her from the beginning

15  "she would be the primary person selling units for Eye Machine and that she would

16  'always' be paid a 42.5 commission." (*Id.* 84.)  Eldred was also aware of the high

17  offering costs, because he and Pocklington "regularly viewed Eye Machine's bank

18  records, which reflected that during each of the first five offerings, Velazquez and

19  Puleo had consistently been paid commissions equaling approximately 42.5 percent

20  of what they raised for Eye Machine." (*Id.* at 86)  All of these allegations prevent

21  defendants from invoking the bespeaks caution doctrine to support their motion to

22  dismiss, regardless of whether they do so to argue their misstatements were

23  immaterial or to negate their scienter.  *See, e.g.*, *SEC v. Richie*, No. EDCV -6-63-

24  VPA SGLX, 2008 WL 2938678, at 6  (C.D. Cal. May 9, 2008) (denying motion to

25  dismiss for lack of scienter where defendants failed to disclose they "were using a

26  large portion of the revenue from the offering to pay for the liabilities already

27  incurred"); *SEC v. JB Oxford Holdings*, No. 04 –07084-PA-VBK, 2004 WL

28  6234910, *5-6 (C.D. Cal. 2004) (denying motion to dismiss Section 10(b) claim for

failure to plead scienter where complaint alleged that company and its officers engaged in undisclosed market timing scheme using deceptive acts).

### 2. The SEC's Allegations that Defendants' Misappropriated Investor Funds are Well Pled

Defendants also contend that the SEC failed to adequately allege they misappropriated investor funds because they supposedly failed to specify which provision(s) in the PPMs prohibit the misappropriation.  (Dkt. No. 27, p. 22.)  To support their argument, defendants point to various other provisions in the PPMs as if to suggest they were allowed to use investor proceeds for just about anything they wanted, including to make payments to Pocklington's wife and to pay for flowers, retail purchases, and charitable and political donations.  (*Id.* at 22-23.)  Specifically, defendants rely on provisions that allowed them to pay Pocklington's wife, through AMC, a fee equal to 7 percent of the gross offering proceeds and up to $25,000 per month in consulting fees, as well as a provision that allowed Eldred to use net offering proceeds for what he deemed "to be in the best interests of the Company." (*Id.* at 23-24.)  Defendants claim business judgment to explain their expenditures and argue that, even if the funds were misappropriated, the statements were not material because of all the warnings investors received and because the funds totaled less than 5 percent of the gross offering proceeds.  (*Id.*)

None of these arguments undermine the specificity or adequacy of the SEC's misappropriation allegations.  Indeed, what defendants either ignore or conveniently overlook is that "a court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor."  *SEC v. One or More Unknown Traders in the Securities of Onyx Pharmaceuticals, Inc.*, 296 F.R.D. 241, 247 (S.D.N.Y. 2013) (*Onyx I*) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678-79 (2009). Here, the SEC alleges that defendants "misappropriated" the net proceeds of investor

Case No. 5:18-cv-00701-JGB-SP

funds and used them to pay for "undisclosed" and "unauthorized expenses," and that "investors were not aware their funds were being used for undisclosed purposes."[4] (Dkt. No. 1 ¶¶ 89, 92.)  The SEC further alleges that Eva Pocklington and the other relief defendants "had no legitimate claim to the money" they received.  (*Id.* at 91.) The complaint even details how much money defendants misappropriated and identifies the expenses for which they improperly used investor money.  (*Id.*)

Defendants ignore all of this and argue that merely saying the payments were "misappropriated," used for "unauthorized" purposes, and that "investors were not aware" is not enough.  Instead, they claim the SEC must explain why they "*were not used* for marketing or for purposes that the Manager deemed in his business judgment."  (Dkt. No. 27, p. 23.)  Nothing in Rule 9(b) compels the SEC "to prove its case in the pleadings."  *SEC v. Zouvas*, No. 3:16-cv-0998-CAB-(DHB), 2016 WL 6834028, *4 (S.D. Cal. Nov. 21, 2016); *SEC v. Bardman*, 216 F. Supp. 3d at 1057. And insisting that the SEC somehow respond to all of defendants' purported defenses in its complaint would wrongly "transpose[] to the pleading stage" a burden reserved for summary judgment.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 n.4 (9th Cir. 2009); *see also S.E.C. v. Mudd*, 885 F. Supp. 2d 654, 660 (S.D.N.Y. 2012) (noting that court's task is to "assess the legal feasibility of the complaint," not to "assay the weight of the evidence which might be offered in support thereof.").

Equally unpersuasive are defendants' arguments that the complaint insufficiently alleges scienter and materiality.  All the SEC has to do in its pleading to

---

[4] Defendants cite *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477 (1977) to argue that this case is nothing more than a "lapse in business judgment by management" and that there was no misleading representation or omission here. (Dkt. No. 27, p. 24.)  This totally ignores the allegations in the complaint.  Unlike *Santa Fe Industries,* this case does not come to the Court "on the premise that the complaint failed to allege a material misrepresentation or material failure to disclose." *Santa Fe Industries Inc.*, 430 U.S. at 475.  The complaint explicitly alleges that these payments were "misappropriated," "unauthorized," and "undisclosed" in the PPMs, and that Eva Pocklington and the other relief defendants "had no legitimate claim to the money" they received.  (Dkt. No. 1 ¶¶ 89, 91, 94.)

show scienter is to generally allege it.  (Dkt. No. 1 ¶¶ 95-96.)  *See, e.g., Fecht v. Price Co.*, 70 F.3d 1078, 1082 n. 4 (9th Cir. 1995); *SEC v. Zouvas*, 2016 WL 6834028, at *9 ("unlike a private action, which requires a plaintiff to plead facts giving rise to a strong inference of scienter, the Commission may allege the scienter element of a securities fraud claim generally") (internal citation and quotations omitted); *SEC v. Mozilo*, 2009 WL 3807124, *14 (same); *SEC v. Bardman*, 2016 WL 6276995, at *7 (same); *SEC v. Jammin Java Corp.*, Case No. 2:15-cv-08921-SVW-MRW, 2016 WL 6595133, *23 (C.D. Cal. Jul. 18, 2016) (same).  Likewise, for materiality, the SEC is not required to specifically allege "how" a reasonable investor could find the misappropriation of $681,587 to be material.  (Dkt. No. 27, p. 25.); *see SEC v. Research Automation Corp.,* 585 F.2d 31, 35-36 (2d Cir. 1978) (misleading statements and omissions concerning the use of money raised from investors were material as matter of law)*; SEC v. TLC Invs. and Trade Co.*, 179 F. Supp. 2d 1149, 1153 (C.D. Cal. 2001) (reasonable investors would consider information that their funds were being misused to be material).  And it is outrageous for defendants to argue that investors would not think having their money stolen was material, so long as defendants stole "less than 5 percent of the gross proceeds."  *See SEC v. Wilde*, No. SACV 11-0315 DOC (AJWx), 2012 WL 6621747, *5 (C.D. Cal. Dec. 17, 2012) ("there is no question a reasonable investor would consider it important that … the money paid for those securities would be misappropriated") (quoting *SEC v. Gallard*, No. 95 Civ. 3099 (HB), 1997 WL 767570, at *3 (S.D.N.Y. Dec. 10, 1997)).  Accordingly, the Court should reject defendants' argument that the SEC failed to allege misappropriation with sufficient particularity, or that it failed to allege the requisite materiality or scienter.

### 3. The SEC's Allegations that Defendants Concealed Pocklington's Control of Eye Machine are Well Pled

Defendants argue that the SEC's complaint also fails to plead facts that plausibly suggest they concealed Pocklington's role in Eye Machine, because the

complaint does not specifically allege they had a duty to disclose that information or that the investors relied on the misstatements (*i.e.*, they were not already aware of Pocklington's role in the company).  (Dkt. No. 27, p. 26.)  According to defendants, other disclosures in the PPMs and the complaint itself suggest that defendants were transparent about Pocklington's role in the company.  (*Id.*)  Defendants argue that this makes any omissions or misstatements they made about Pocklington's role in the company immaterial and negates their scienter.  (*Id.* at 27.)

To be clear, defendants' duty not to be misleading arose as soon as they started soliciting investors.  In other words, "[f]ederal [securities] law require persons to tell the truth about material facts once they commence speaking." *Ackerman v. Schwartz*, 947 F.2d 841, 846 (7th Cir. 1991).  This includes omissions.  Rule 10b-5 "imposes a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992).  "That duty is a general one, and arises whenever a disclosed statement would be 'misleading' in the absence of the 'disclos[ure] of [additional] material facts' needed to make it not misleading."  *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (quoting *Hanon*, 976 F.2d at 504).

Furthermore, defendants mischaracterize the complaint when they say that it suggests defendants were "transparent about Pocklington's role" in the company.  The complaint alleges that Pocklington's role in the company "was understood by those working *at the company*."  (Dkt. No. 1 ¶57.) (emphasis added.)  And the SEC is not required to specifically allege that investors did not understand Pocklington's role at the company or relied on defendants' misstatements.  The cases are clear that these types of allegations are not required in an action brought by the SEC.  *See, e.g., SEC v. Medical Capital Holdings, Inc.*, No. SACV 09–0818 DOC (RNBx), 2010 WL 809406, at *3 (C.D. Cal. Feb. 24, 2010) (noting that since reliance is not an element of SEC claims, "the SEC is not required under Rule 9(b) to plead which particular investors were injured by their reliance on the false statements"), *citing SEC v. Rana*

*Research, Inc.*, 8 F.3d at 1364 (9th Cir.1993); *SEC v. Trabulse*, 526 F. Supp. 2d 1001, 1005 (N.D. Cal. 2007) (denying motion to dismiss, noting that "the SEC does not have to identify individual investors who relied upon the alleged misrepresentations or omissions").  As explained above, the SEC need not do more than generally allege defendants' scienter and, as for the issue of whether Pocklington's role in the company was material, that is not a question to be decided by this motion.  *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) ("'materiality' of a misstatement or omission is normally a question left to the trier of fact"); *SEC v. City of Victorville*, ED CV13-00776 JAK (DTBx), 2012 U.S. Dist. Lexis 164530, *18-19 (C.D. Cal. Nov. 14, 2013) (rejecting defendants' materiality arguments at motion to dismiss stage).

### D.   The Complaint Adequately Alleges that Pocklington and Eldred "Made" the Misstatements

Defendants Pocklington and Eldred separately argue that the complaint does not adequately allege they "made" the misrepresentations contained in the PPMs for purposes of Rule 10b-5(b) and Section 17(a)(2).  (Dkt. No. 27, p. 30.)  Defendants rely on *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011).  However, *Janus* has no bearing on their Section 17(a)(2) claims.  In *Janus,* the Supreme Court held that only someone who "makes" a misleading statement or omission, or who has "ultimate authority over" it, can be held liable under Rule 10b-5.  *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. at 2302.  The Court in *Janus* did not even refer to Section 17(a), nor did it impliedly extend its reasoning to the separate anti-fraud provisions that prohibit conduct other than the making of a false statement.  *See SEC v. Mercury Interactive*, *LLC*, No. 07-cv-02822-WHA, 2011 WL 5871020, at *3 (N.D. Cal. Nov. 22, 2011) (*Janus* not applicable to claims under Section 17(a)); *SEC v. Daifotis*, No. C-11-00137-WHA, 2011 WL 3295139, at *5-6 (N.D. Cal. Aug. 1, 2011) (same); *see also SEC v. Benger*, 931 F. Supp. 2d 904, 906 (N.D. Ill. 2013) ("vast majority of courts dealing with the

question of whether *Janus* also applies to claims under Section 17 have answered that question with a resounding 'no'").

Pocklington argues that his 10b-5(b) claim should still be dismissed because the complaint does not allege that he had "ultimate authority" over the PPMs or that he had "discretion to change the content" of the statements.  (Dkt. No. 27, p. 29.) This argument is based on a misreading of *Janus* and a misreading of the complaint. *Janus* did not create some talismanic formula for drafting Rule 10b-5 allegations and it did not "alter the well-established rule that [an entity] can act only through its employees and agents."  *See In re Merck & Co., Inc. Securities, Derivative, & ERISA Litigation*, No. 11-cv-1658 (SRC), 2011 WL 3444199, *25 (D. NJ Aug. 8, 2011).  In other words, despite *Janus*, a 10b-5(b) claim is adequately pled if it alleges that the defendant was involved in drafting, reviewing and/or disseminating the false and misleading statements, and had authority over them.  *In re Pfizer Inc. Securities Litigation,* Nos. 04-cv-9866(LTS)(HBP), 05-MD-1688(LTS), 2012 WL 983548, *3 (S.D.N.Y. Mar. 22, 2012)*; Carpenters Pension Trust Fund of St. Louis, St. Clair Shores Police & Fire Retirement System v. Barclays PLC*, 56 F.Supp.3d 549, 559 (S.D.N.Y. 2014) (denying motion to dismiss 10b-5(b) claims where plaintiff alleged president instructed others to make statement); *In re Fannie Mae 2008 Sec. Litig.*, 891 F.Supp.2d 458 (S.D.N.Y. Aug. 30, 2012) (corporate insider responsible for unsigned statements under his control); *Touchtone Grp. v. Rink*, No. 11-cv-02971, 2012 WL 6652850 (D. Colo. Dec. 21, 2012) (General Counsel who "prepared or reviewed" allegedly false securities offerings "had ultimate authority over the statements [he] prepared," even in the absence of attribution, given his role as a senior officer of the company).

Pocklington is also misreading the complaint.  It goes well beyond simply alleging that he "helped" draft the PPMs by "providing" the factual information contained in them and by "reviewing" them before they were provided to investors.

1    To be sure, under the cases cited above, this would have been enough, but the SEC's

2    complaint further alleges that Pocklington "was the one who actually controlled Eye

3    Machine" and that he had "ultimate decision-making authority and control over Eye

4    Machine." (Dkt. No. 1 ¶¶ 54-55.)  It also alleges Pocklington "made" all of the

5    misrepresentations and omissions in the PPMs and possessed, directly and indirectly,

6    the power to direct or cause the direction of management and policies of Eye

7    Machine.  (*Id.* ¶¶ 62, 144.); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices,*

8    *& Prod. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2017 WL 3058563, at *8 (N.D. Cal.

9    July 19, 2017) (finding CEOs of two Volkswagen subsidiaries to be "makers" of

10   statements because the complaint alleged facts that the two CEOs "actually

11   participated in and had authority over" the filings containing the false statements).

12         All of the cases Pocklington cites to support his argument are easily

13   distinguished and do not apply in this context.  Pocklington relies on *Reese v. BP*

14   *Exploration (Alaska) Inc.* and *Oaktree Principal Fund V, LP v. Warburg Pincus LLC*,

15   two cases in which the courts were essentially considering, as in *Janus*, whether one

16   entity could be held liable for the statements of another entity under 10b-5(b).[5]  *Reese*

17   *v. BP Exploration (Alaska) Inc.*, 643 F.3d 681 (9th Cir. 2011) (considering whether

18   BP Exploration (Alaska) Inc. could be held liable for statements made by BP Prudhoe

19   Bay Royalty Trust); *Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, No. 15-

20   cv-8574, 2016 WL 6782768, *10 (C.D. Cal. Aug. 9, 2016) (considering whether

21   Warburg could be held liable for statements made by Rural/Metro).  That is not what

22

23   [5] Defendants also cite *SEC v. Mercury Interactive, Inc.*, No. 07-cv-2822, 2011 WL
     5871020, *2 (N.D. Cal. Nov. 22, 2011) for support, but in that case the district court
24   said it "need not resolve" whether the alleged misstatements stated a viable claim
     under 10b-5(b), making the language defendants rely on dicta.  Furthermore, the
25   district court's passing comment pertained to a complaint where the misstatements
     were not signed by defendant or "otherwise attributable to her."  *Id.*  Here, since the
26   complaint alleges that Pocklington was a control person of Eye Machine, "provided"
     the factual content of the misstatements, and "reviewed" them before they went to
27   investors, they are attributable to him.  *In re Pfizer Inc. Securities Litigation,* 2012
     WL 983548 at *3.
28

the SEC is alleging happened in this case.  The SEC is alleging that Pocklington made the statements in the PPMs and is liable for them through his direct and indirect control of Eye Machine.  *See In re Pfizer Inc. Securities Litigation,* 2012 WL 983548 at *3 (holding that *Janus* was not applicable where 10b-5(b) claim premised on the fact that defendants themselves made several of the misstatements at issue.).

Eldred also misreads *Janus* when he argues that the 10b-5(b) claim against him warrants dismissal.  (Dkt. 29, pp. 3-5.)  Eldred insists that, because the SEC's complaint alleges he was just a "visual front" for the Eye Machine and not in actual "control" of the company, the SEC cannot claim that he was the "maker" of the misstatements in the PPMs.  (*Id.* at 4-5.)  Eldred's argument fails because the complaint does not allege that Pocklington had exclusive control of the company, and nothing in *Janus* precludes statements from having multiple makers.  *City of Pontiac General Employees' Retirement System v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012).  *Janus* "has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability."  *City of Pontiac,* 875 F. Supp. 2d at 374.  Here, the complaint alleges that "Pocklington and Eldred each helped draft the PPMs, by providing the factual information contained in the PPMs, and by reviewing the PPMs before they were provided to investors."  (Dkt. No. 1 ¶ 47.)  Therefore, as in *City of Pontiac*, "there is no tension" between the SEC's complaint and the Supreme Court's ruling in *Janus*.  *City of Pontiac,* 875 F. Supp. 2d at 374.

### E.   The Complaint Alleges with Sufficient Particularity that Walton Negligently Defrauded Investors

Defendant Walton argues that the complaint fails to plead with sufficient particularity that he negligently defrauded investors.  (Dkt. No. 27, p. 30.)  Defendant admits that his argument is really no different than the one raised by the other defendants regarding the misappropriation of investor funds (*i.e.*, "nothing about the expenditures was fraudulent") and it has already been addressed above.  (*Id.*)

Walton argues that the SEC must allege the applicable standard of care or how he fell below it as a CPA.  (Dkt. No. 27, p. 31.)   According to Walton, this means alleging that, as a CPA, Walton had a duty to engage or not to engage in the acts he is alleged to have committed or failed to have committed.  (*Id.*)  He says it is not enough for the SEC to simply allege he was negligent.  This argument fails for several reasons.  First, as explained above, unlike private litigants, the SEC may generally allege Walton's negligence.  Second, as Walton concedes, the SEC did far more than that in its complaint.  (*Id.* at 30.)  The SEC alleges Walton engaged in repeated acts that resulted in investors being defrauded, including that he "took no steps" to determine whether certain expenditures of investor funds were permitted under the PPMs, "never" read the portions of the PPMs explaining how investor proceeds should have been spent, and personally signed "at least one of the improper payments" made from investor funds.  (Dkt. No. 1 ¶ 98.)

Finally, Walton is wrong when he argues that the SEC must allege more than simple negligence or somehow tie his conduct to the duties or standards imposed on a CPA.  The Supreme Court held that negligence is all that is required to prove a violation of Section 17(a)(3), because it "focuses upon the effect of particular conduct on members of the investing public, rather than upon the culpability of the person responsible."  *Aaron v. SEC,* 446 U.S. 680, 681 (1980).  For example, in *Hughes Capital,* the Third Circuit upheld the liability of a bookkeeper under 17(a)(3) using a simple negligence standard and did not look to any accounting standards or specialized training he may have received as a bookkeeper.  *See S.E.C. v. Hughes Capital Corp.*, 124 F.3d 449, 453-454 (3d Cir. 1997).  The Third Circuit did this even though the bookkeeper claimed that he merely executed the transactions necessary to perpetuate the fraudulent scheme, was simply doing what he was told to do, and had no background or knowledge that would have enabled him to find any of the transactions suspicious.  *Id.*  In other words, the court in *Hughes* simply looked to the reasonableness of the defendant's conduct and whether he acted negligently.  In light

of *Hughes* and the Supreme Court's ruling in *Aaron*, the Court should find that in this case the SEC's complaint adequately pleads a violation of Section 17(a)(3) because it alleges, among other things, that Walton's conduct was "negligent" and that he "failed to exercise reasonable care in discharging his responsibilities to Eye Machine and its investors." (Dkt. No. 1 ¶ 98.); s*ee also Weiss v. SEC*, 468 F.3d 849, 855 (D.C. Cir. 2006) (analyzing Section 17(a)(3) claim against bond counsel under a negligence standard and whether the defendant acted reasonably where he "fail[ed] to look for even minimal objective" support for school district's statements in bond prospectus when approving prospectus and issuing opinion letters).

### F.    The SEC's Aiding and Abetting Claims Should Not Be Dismissed

Finally, defendants Pocklington and Eldred argue that "for the same reasons" they argue that the SEC's primary claims under Section 10b and Rule 10b-5 and Section 17(a) should be dismissed, the aiding and abetting claims should also be dismissed.  (Dkt. No. 27, pp. 32-33; Dkt. No. 29, pp. 5-6.)  The SEC submits that for the same reasons set forth above, its aiding and abetting claims against Pocklington and Eldred are well pled and should not be dismissed.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the SEC respectfully requests that the court deny defendants' motions to dismiss.


Dated:  August 13, 2018

                                    */s/ Douglas M. Miller*
                                    DOUGLAS M. MILLER
                                    Attorney for Plaintiff
                                    Securities and Exchange Commission

# **PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On August 13, 2018, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO MOTIONS TO DISMISS** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐ **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  August 13, 2018

*/s/ Douglas M. Miller*
Douglas M. Miller

*SEC v. Peter H. Pocklington, etc. et al*
**United States District Court—Central District of California**
**Case No.** 5:18-cv-00701-JGB-SP

## <u>SERVICE LIST</u>

Becky S. James, Esq. **(served by CM/ECF only**)
Jaya C. Gupta, Esq. **(served by CM/ECF only**)
Rachael A. Robinson, Esq. **(served by CM/ECF only**)
James & Associates
23564 Calabasas Road, Suite 201
Calabasas, CA 91302
Email:  bjames@jamesaa.com
        jgupta@jamesaa.com
        rrobinson@jamesaa.com
*Attorneys for Defendants Peter H. Pocklington, Terrence J. Walton,*
*Robert A. Vanetten, Nova Oculus Partners, LLC (f/k/a the Eye*
*Machine, LLC), AMC Holdings, LLC and Relief Defendants Eva S.*
*Pocklington, DTR Holdings, LLC, Cobra Chemical, LLC, and Gold*
*Star Resources, LLC*

Michael P. McCloskey, Esq. **(served by CM/ECF only**)
David J Aveni, Esq. **(served by CM/ECF only**)
Wilson, Elser, Moskowitz, Edleman and Dicker
401 W. A Street, Suite 1900
San Diego, CA 92101-7908
Email:  michael.mccloskey@wilsonelser.com
        david.aveni@wilsonelser.com
*Attorneys for Defendant Lantson E. Eldred*

Sam Y. Edgerton, III **(served by CM/ECFonly**)
Johnny Lee Antwiler, II **(served by CM/ECF only**)
Freeman Mathis & Gary, LLP
2615 Pacific Coast Highway, Suite 300
Hermosa Beach, CA 90254
Email:  sedgerton@fmglaw.com
        jantwiler@fmglaw.com
*Attorneys for Defendants Yolanda Velazquez and Vanessa Puleo*