DOUGLAS M. MILLER (Cal. Bar No. 240398)
Email: millerdou@sec.gov
KATHRYN C. WANNER (Cal. Bar No. 269310)
Email: wannerk@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
John W. Berry, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

vs.

PETER H. POCKLINGTON, LANTSON E. ELDRED, TERRENCE J. WALTON, YOLANDA C. VELAZQUEZ a/k/a LANA VELAZQUEZ a/k/a LANA PULEO, VANESSA PULEO, ROBERT A. VANETTEN, NOVA OCULUS PARTNERS, LLC, f/k/a THE EYE MACHINE, LLC, and AMC HOLDINGS, LLC,

Defendants.

EVA S. POCKLINGTON, DTR HOLDINGS, LLC, COBRA CHEMICAL, LLC, and GOLD STAR RESOURCES, LLC.

Relief Defendants.

Case No. 5:18-cv-00701-JGB-SP

**SECOND AMENDED COMPLAINT**

Judge: Hon. Jesus G. Bernal
Courtroom: 1 (Riverside Courthouse)

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because defendants Peter H. Pocklington, Lantson E. Eldred, Terrence J. Walton and Robert A. Vanetten all reside in this district, and the principal places of business of defendants Nova Oculus Partners, LLC, formerly The Eye Machine, LLC, and AMC Holdings, LLC are located in this district.

## SUMMARY

4. From 2014 to at least 2017, the defendants raised over $14 million from more than 260 investors. But while doing so, they concealed the true identity of the person at the helm of the company, misappropriated investor funds to pay personal expenses, and funneled undisclosed and excessive commissions to their sales agents.

5. The company at the heart of this fraud is defendant Nova Oculus Partners, LLC, formerly The Eye Machine, LLC ("Eye Machine"), which was founded by defendant Peter H. Pocklington ("Pocklington"), ostensibly to develop a medical device to treat macular degeneration. Pocklington, however, is a convicted

felon who has also been sanctioned by Arizona regulators for securities fraud. So, to prevent investors from learning that he is in control of Eye Machine, he had his co-defendant, Lantson E. Eldred ("Eldred"), serve as the "visual front" of the company, while Pocklington controlled the company from behind the scenes. To further this deception, the majority shareholder of Eye Machine is defendant AMC Holdings, LLC ("AMC Holdings"), a holding company owned indirectly by Pocklington's wife.

6. In addition to concealing Pocklington's role, Pocklington and Eldred made false and misleading statements to investors about how investor funds would be spent. They claimed in the private placement memoranda that only 28% of the money raised from investors was "expected" to be used for "offering costs," such as commissions and accounting, legal and printing expenses. They knew, however, that they were spending significantly more just on sales commissions alone.

7. The bulk of those commissions went to defendants Vanessa Puleo ("Puleo"), Yolanda C. Velazquez ("Velazquez"), and Robert A. Vanetten ("Vanetten"). And they were paid more than the 28% disclosed to investors. For example, Puleo and Velazquez (who is a two-time securities law recidivist herself) received an outsized commission of 42.5%. These and other extremely high commissions resulted in Eye Machine spending more than 40% of gross investor funds on offering costs – well more than what was disclosed to investors.

8. Pocklington and Eldred further defrauded investors by siphoning off at least $681,587 of investor funds. Defendant Terrence J. Walton ("Walton"), who held himself out as Eye Machine's CFO, performed bookkeeping functions for the company. Walton failed to act reasonably in that he took no steps to determine whether Pocklington and Eldred's use of investor funds were authorized under the PPM.

9. In addition, defendants Eye Machine, Pocklington, Eldred, Velazquez, Puleo, and Vanetten violated the SEC's registration requirements. For one, Eye Machine's securities offering was never registered with the Commission, as it was

required to be. The offering did not qualify for any exemptions from these registration requirements, in part because of the prior securities fraud enforcement orders and judgments against Pocklington and Velazquez.

10. By engaging in this conduct:

(a) defendants Eye Machine, AMC Holdings, Pocklington, and Eldred each have violated and may be continuing to violate the antifraud provisions of Section 17(a)(1) and (a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1) and (3), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) and (c);

(b) defendant Walton has violated and may be continuing to violate the antifraud provisions of Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3);

(c) defendants Eye Machine, AMC Holdings, and Pocklington each have violated and may be continuing to violate the antifraud provisions of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2);

(d) defendants Eye Machine, Pocklington, and Eldred each have violated and may be continuing to violate the antifraud provisions of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b);

(e) defendants Pocklington and Eldred each have aided and abetted, and may be continuing to aid and abet Eye Machine's violations of these Exchange Act antifraud provisions under Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b), and 20(e) of the Exchange Act, 15 U.S.C. § 78t(e);

(f) defendant Pocklington also has violated, and may be continuing to violate, the antifraud provisions of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, as a control person of defendant Eye Machine, under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a);

(g) defendants Eye Machine, Pocklington, Eldred, Velazquez, Puleo,

and Vanetten each have violated, and may be continuing to violate, the securities registration provisions of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §77f;

(h) defendants Velazquez, Puleo, and Vanetten each have violated, and may be continuing to violate, the broker-dealer registration provisions of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a); and

(i) defendant Velazquez has also violated, and may be continuing to violate, Section 15(b)(6)(B)(i) of the Exchange Act, 15 U.S.C. § 78o(b)(6)(B)(i), because she acted as an unregistered broker-dealer in direct contravention of a prior SEC order permanently barring her from doing so.

11. With this action, the SEC seeks permanent injunctive relief against the defendants to prevent future violations of the federal securities laws, disgorgement of ill-gotten gains from certain defendants and from the relief defendants, along with prejudgment interest, and civil penalties from certain defendants.

## THE DEFENDANTS

12. Defendant The Eye Machine, LLC (now known as Nova Oculus Partners, LLC) is a Delaware limited liability company, headquartered in Indian Wells, California. Eye Machine was founded to develop, manufacture, and lease a biomedical device designed to deliver electrical current to the eye, for potential use in treating patients with macular degeneration. Eye Machine and its securities have never been registered with the SEC.

13. Defendant AMC Holdings, LLC is a Delaware limited liability company, headquartered in Indian Wells, California. AMC Holdings is the majority shareholder of Eye Machine and is owned by a private trust. Relief defendant Eva Pocklington is the beneficial owner of that trust.

14. Defendant Peter H. Pocklington is a citizen of Canada, where he previously owned several businesses, including car dealerships and a team in the National Hockey League. He is currently residing in Palm Desert, California. Pocklington is the undisclosed founder and undisclosed control person of Eye

Machine.

15. Defendant Lantson E. Eldred resides in Palm Desert, California and was ostensibly the manager of Eye Machine and AMC Holdings. Eldred is a lawyer and has been admitted to practice law in California since 1978.

16. Defendant Terrence J. Walton resides in Palm Springs, California. He is a CPA and has held himself out as the chief financial officer ("CFO") of defendant Eye Machine. Walton has been licensed as a CPA in California since 1980.

17. Defendant Yolanda C. Velazquez (a/k/a Lana Velazquez a/k/a Lana Puleo) resides in Orlando, Florida. As the manager of a now-defunct company, Velazquez and salespeople she hired solicited investors on behalf of Eye Machine.

18. Defendant Vanessa Puleo resides in Orlando, Florida and is married to defendant Velazquez. As the manager of a separate and now-defunct company, Puleo and salespeople she hired solicited investors on behalf of Eye Machine.

19. Defendant Robert A. Vanetten resides in Mission Viejo, California. In the past, he has held Series 22 and Series 63 licenses. Through a company he owned, Vanetten solicited and may be continuing to solicit investors on behalf of Eye Machine.

**THE RELIEF DEFENDANTS**

20. Relief defendant Eva S. Pocklington ("Eva Pocklington") is a Canadian citizen with permanent residency in the United States, who resides in Palm Springs, California. Eva Pocklington is Pocklington's wife and the beneficial owner of the private trust that owns defendant AMC Holdings – the majority shareholder of Eye Machine.

21. Relief defendant DTR Holdings, LLC ("DTR Holdings") is a Delaware limited liability company headquartered in Indian Wells, California and is ostensibly managed by Eva Pocklington. Eva Pocklington is the beneficial owner of the private trust that owns DTR Holdings.

22. Relief defendant Cobra Chemical, LLC ("Cobra Chemical") is a

Delaware limited liability company headquartered in Indian Wells, California and is managed by Eldred.

23. Relief defendant Gold Star Resources, LLC ("Gold Star Resources") is a Delaware limited liability company headquartered in Indian Wells, California and is managed by Eldred.

## THE FRAUD

### A. Pocklington's and Velazquez's Criminal and Regulatory History

24. Several years before Eye Machine began its private offering, two of the key participants in that offering, Pocklington and Velazquez, had each been disciplined for various securities laws violations, and Pocklington had been prosecuted for criminal misconduct.

25. On or about May 21, 2010, Pocklington pleaded guilty to one felony count of perjury in the matter of *United States v. Pocklington*, ED CR-09-00043-(A)-VAP (C.D. Cal.).

26. As part of his guilty plea, Pocklington admitted, under oath, that he deliberately made false statements under penalty of perjury to the United States Bankruptcy Court.

27. On or about October 27, 2010, Pocklington was sentenced to two years of probation, a $3,000 fine and 100 hours of community service.

28. Subsequently, on or about May 8, 2013, Pocklington, without admitting or denying the Findings of Fact and Conclusions of Law, consented to a cease and desist order by the Arizona Corporation Commission for his involvement in private offerings related to two mining companies, in *In the Matter of Crystal Pistol Resources, LLC, et al.*, S-20845A-12-0134.

29. The Arizona Corporation Commission found that Pocklington had engaged in state securities fraud, securities registration, and salesman-dealer registration violations with respect to the two mining companies.

30. According to the Arizona Corporation Commission, Pocklington led

investors to believe, among other things, that the mining companies had obtained mineral rights to a mine in Arizona and would begin mining and processing gold within a short period of time when, in fact, the analyses relating to the quantity of gold in the mining claims were not supported by any of the sampling done in the reports disclosed to investors and the mining companies' estimates of gold resources were not supportable with industry methods available at that time.

31. Pocklington was ordered to pay $5,149,316 in restitution and an administrative penalty of $100,000.

32. As for Velazquez, on or about February 15, 2005, she consented, without admitting or denying the facts alleged in the SEC's complaint, to the entry of a final judgment against her in the SEC enforcement case *SEC v. Crowley, et al.*, 04-80354-CIV (S.D. Fl.). In that consent, she agreed to the entry of permanent injunctions against violations of the antifraud, touting, securities registration, and broker-dealer registration provisions of the federal securities laws.

33. The SEC's complaint included allegations that Velazquez had failed to fully disclose the receipt of or amount of her company's compensation for promoting an investment, and otherwise engaged in conduct that operated as a fraud and deceit on investors.

34. Velazquez was ordered to disgorge $301,581 plus prejudgment interest and pay a civil penalty of $120,000. She also consented to be barred from participating in penny stock offerings, and further consented, in a follow-on SEC administrative proceeding, to be barred by the SEC from associating with any broker-dealer.

35. On or about June 8, 2009, the SEC sued Velazquez a second time in *SEC v. Berkshire Resources, L.L.C., et al.*, 1:09-cv-00704-SEB-JMS (S.D. Ind.). There again, without admitting or denying the allegations, Velazquez consented to the entry of another final judgment, this one imposing permanent injunctions against violations of the securities registration and broker-dealer registration provisions and Section

15(b)(6)(B)(i) of the Exchange Act.

36. In the second SEC enforcement action against her, Velazquez was ordered to disgorge $280,329.08 plus prejudgment interest and pay a civil penalty of $130,000.

**B. The Formation of Eye Machine**

37. In or about January 2014, less than a year after the Arizona Corporation Commission entered the cease and desist and over $5 million restitution order against him, Pocklington directed Eldred to form Eye Machine and AMC Holdings.

38. Pocklington, who has publicly stated that he suffers from macular degeneration, created Eye Machine ostensibly to develop, manufacture and lease to medical professionals a biomedical device (or an "eye machine") designed to deliver an electrical current to specific regions of the eye, to treat age-related macular degeneration and other forms of eye diseases.

39. AMC Holdings acted as the holding company for all of Eye Machine's membership interests and is its majority shareholder. In addition, AMC Holdings received a management administration fee from Eye Machine, and identified Eldred as the manager of AMC Holdings. Eva Pocklington owns AMC Holdings through a private trust that Eldred created at the direction of Pocklington.

40. In actuality, Pocklington controlled Eye Machine at all relevant times.

**C. Eye Machine's Solicitation of Investors**

41. Between April 2014 and May 2017, Eye Machine conducted six private offerings, raising at least $14,089,422 from over 260 investors in several states.

42. These offerings were all part of a single, ongoing financing scheme. They all involved the offer and sale of the same class of securities (limited liability membership units), provided for the same type of consideration (cash), and were for the same general purpose (to fund Eye Machine's operations).

43. Eye Machine solicited investors for the offerings through sales agents, who cold-called prospective investors off of lead lists, provided information to

investors on password-protected websites, and conducted investor conference calls.

44. The Eye Machine units were, and may continue to be, offered and sold through interstate commerce.

45. Prior to investing, investors were given copies of the private placement memoranda ("PPMs") and signed subscription agreements that acknowledged their receipt of the PPMs.

46. The offerings, of limited liability membership interest units at $1 per unit, were made pursuant to at least six PPMs:

(a) the first PPM, dated April 10, 2014, offered $10 million in units;

(b) the second PPM, dated March 31, 2015, offered $10 million in units;

(c) the third PPM, dated June 29, 2015, offered $10 million in units;

(d) the fourth PPM, dated March 31, 2016, offered $7 million in units;

(e) the fifth PPM, dated September 6, 2016, offered $7 million in units; and

(f) the sixth PPM, dated February 1, 2017, offered, and may continue to be offering, $7 million in units.

47. Pocklington and Eldred each had ultimate control and authority over the contents of the PPMs. Each provided the factual information contained in the PPMs to Eye Machine's outside counsel, who then used that information to draft the PPMs, and each reviewed the PPMs before they were provided to investors.

48. Eldred's authority and control over the content of Eye Machine's PPMs, included, but was not limited to:

(a) reviewing and approving for outside counsel the sections of the PPMs which describe AMC Holdings and Eldred's connection with Eye Machine but omit mention of Pocklington's involvement with Eye Machine;

(b) reviewing and approving for outside counsel the PPMs' use of proceeds section; and

(c) signing and sending a letter to Eye Machine's outside counsel verifying that each PPM was complete, final, and ready to be sent to investors.

49. The PPMs attached and referenced the operating agreement and the subscription agreement for the Eye Machine, both of which listed Eldred as the signatory in his capacity as manager. The subscription agreement stated that the units were offered "pursuant to" the PPMs and that the representations in the PPM were "authorized by the Company."

50. Eldred also signed the subscription agreements provided to Eye Machine's investors as part of their investment materials and which specifically referenced the associated PPMs.

51. Eldred and others would, if necessary due to Pocklington's eyesight, explain the key provisions of the PPMs to Pocklington so he understood what was being said in them.

52. According to a Form D and Form D/A, Notice of Exempt Offering of Securities, filed with the SEC on or about February 27, 2018 and March 16, 2018, respectively, Eye Machine is in the process of conducting a seventh private offering.

53. Upon information and belief, this seventh offering is also part of the same single, ongoing financing scheme, in part, because it provides for the same type of consideration (cash).

54. Eye Machine has continued to solicit prospective investors, including as recently as a September 2018, when defendant Vanetten contacted an investor and solicited an investment in Eye Machine, in part, by falsely suggesting that the SEC had dropped all charges against Eye Machine.

**D. Pocklington's Hidden Control of Eye Machine**

55. Defendants Eye Machine, AMC Holdings, Pocklington, and Eldred took several steps, including making false and misleading statements and engaging in deceptive acts, to conceal Pocklington's control of Eye Machine, and thereby covered up his prior disciplinary record.

56. The PPMs each contained false and misleading statements about who controlled Eye Machine and managed its day-to-day operations. According to the PPMs, Eldred had "full, exclusive and complete authority and discretion in the management and control of the business" of Eye Machine, subject only to the right of the members to vote on certain matters. The PPMs also touted Eldred's professional and educational accomplishments.

57. Although the PPMs provided that Eldred could delegate his management authority, the PPMs stated that any person with delegated authority would act under Eldred's supervision in administering Eye Machine's day-to-day operations.

58. The statements in the PPMs regarding Eldred's role as manager of Eye Machine were misleading because Pocklington was the one who actually controlled Eye Machine.

59. Contrary to what was disclosed to investors, Pocklington had ultimate decision-making authority and control over Eye Machine, as evidenced by, for example, the following:

(a) Pocklington researched the underlying technology, identified scientists, surveyed competitors, and assembled Eye Machine's team and technology;

(b) Pocklington did the hiring and firing for Eye Machine, including hiring Eldred and deciding how much he would be paid;

(c) Pocklington instructed Eye Machine's chief operating officer to take business matters directly to him – and not to Eldred;

(d) Significant financial decisions involving Eye Machine could not be made without Pocklington's input; and

(e) Pocklington decided who received shares of Eye Machine and had the authority to allocate shares to himself and others, including Walton and Eldred.

60. Pocklington's control over Eye Machine was understood by those working at the company.

61. Pocklington himself acknowledged that he made the "big picture

decisions" for the company, and described Eldred as the "visual front" of the company who was nothing more than a "figurehead."

62. Likewise, Eva Pocklington, whose private trust owned AMC Holdings (Eye Machine's majority shareholder), described Pocklington as the "big boss" of Eye Machine.

63. Despite his control of the company, Pocklington's name appeared nowhere in the first five Eye Machine PPMs.

64. The sixth Eye Machine PPM misleadingly described Pocklington as an "administrator and advisor," without disclosing his control of the company.

65. The misrepresentations and omissions in the PPMs about Pocklington's true role at the company pertained to material facts that reasonable investors would have found important in making their investment decisions, particularly given Pocklington's prior history of fraud, including his felony perjury conviction and cease and desist consent order for securities fraud.

66. The misrepresentations and omissions in the PPMs as to Pocklington's control of Eye Machine were made by Pocklington, Eldred and Eye Machine.

67. Pocklington, Eye Machine and AMC Holdings each received money in the form of investors' investments, by means of the misleading statements in the PPMs regarding Pocklington's control of Eye Machine.

68. Defendants Pocklington, Eldred, and Eye Machine knew, or were reckless in not knowing, that the PPMs misleadingly omitted Pocklington's control of the company, including his prior record.

69. In addition, defendants Pocklington, Eye Machine, and AMC Holdings failed to exercise reasonable care as to the representations in the PPMs as to who controlled Eye Machine, and thus were negligent.

70. To further conceal Pocklington's control over Eye Machine, Pocklington and Eldred engaged in several deceptive acts beyond what was written in the PPMs, which gave investors a false and misleading appearance as to who really controlled

the company.

71. At Pocklington's direction, Eldred created AMC Holdings to act as the majority shareholder of Eye Machine and created a private trust to act as the owner of AMC Holdings. This effectively distanced Pocklington from Eye Machine and AMC Holdings and helped conceal his *de facto* control over Eye Machine.

72. Pocklington concealed his full identity during conference calls with investors by allowing himself to be introduced simply as "Peter, one of our significant investors."

73. Pocklington and Eldred concealed Pocklington's management and control of Eye Machine from their outside counsel, who helped them prepare the PPMs, representing to outside counsel that Pocklington would only act as an "advisor" to Eye Machine.

74. Eldred concealed Pocklington's management and control of the Eye Machine on or about February 9, 2016, when, under penalty of perjury, he signed a declaration stating that Pocklington "is a consultant for Eye Machine but is not now and has never been a shareholder or officer of The Eye Machine." The declaration was filed by Eye Machine in Los Angeles Superior Court in support of a legal brief opposing a motion to strike Eye Machine's civil complaint as a SLAPP Suit, *The Eye Machine, LLC v. Wasserman, Comden, Casselman & Esensten, LLP, et al.*, Case No. BC 603 834 (Los Angeles Sup. Ct., Feb. 9, 2016).

75. In addition, Eldred signed, on behalf of Eye Machine three Forms D, Notice of Exempt Offering of Securities, and three Forms D/A (amendments to Form D), publicly filed with the SEC between on or about August 25, 2014 and on or about September 26, 2016. Pocklington's name does not appear in any of these forms.

76. Eldred also later signed two Forms D and one Form D/A, publicly filed with the SEC on April 12, 2017, February 27, 2018, and March 16, 2018. Pocklington's name appears in these forms, but he is misleadingly described as just an "Administrator."

77. In each of the five Forms D and three Forms D/A filed on behalf of Eye Machine, Eldred claimed that Eye Machine's offering was exempt from registration with the SEC pursuant to Regulation D and certified that the offering was not disqualified from relying on a Regulation D exemption for any of the reasons stated in Rule 506(d). But, as alleged in more detail below, that rule states that the exemption is unavailable if any of the individuals participating in the offering are undisclosed "bad actors," which Pocklington and Velazquez, both recidivists, are.

78. Concealing Pocklington's control of Eye Machine enabled Eye Machine, AMC Holdings, Pocklington, and Eldred to conceal Pocklington's extensive prior record of criminal and regulatory violations from investors.

79. Defendants Pocklington, Eldred, Eye Machine, and AMC Holdings knew, or were reckless in not knowing, that their deceptive acts were giving investors a false appearance as to who truly controlled Eye Machine.

80. In addition, defendants Pocklington, Eldred, Eye Machine, and AMC Holdings failed to exercise reasonable care in carrying out the deceptive acts that created a false appearance as to who truly controlled the company.

81. These deceptive acts that concealed Pocklington's role at the company pertained to material facts that reasonable investors would have found important in making their investment decisions.

**E. Misappropriation and Misrepresentations Related to Investor Funds**

82. Defendants Eye Machine, Pocklington, and Eldred made several false and misleading statements in the PPMs about how investor money would be spent and, along with AMC Holdings, misappropriated investor funds.

83. The PPMs claimed, in substance, that only approximately 28% of the gross offering proceeds were "expected" to be used to pay all of the offering costs for the offerings, which included commissions and things like accounting, legal, and printing expenses.

84. In fact, approximately 39% of the gross offering proceeds (or

approximately $5,477,742) went to pay sales commissions alone.

85. The bulk of the commissions were paid to defendants Velazquez and Puleo, who raised approximately $11 million for Eye Machine between about June 2014 and about January 2017. Together they received approximately $4,733,025 (or a commission of approximately 42.5%).

86. Defendant Vanetten, who raised at least $442,000 for Eye Machine between March 2016 and May 2017, received approximately $152,020 (or a commission of approximately 34%).

87. Although the "Risk Factors" section in the PPMs stated that syndication costs, such as commissions and similar offering costs, "may be higher than expected" and "could range up to 50% of the capital raised," these statements failed to disclose that offering costs were consistently higher than 28%. In fact, over the course of the first six private offerings, approximately 40.72% of the funds raised from investors went to pay offering costs (not 28%). Commissions made up more than 90% of those offering costs.

88. Pocklington was the one who arranged for Eye Machine to hire Velazquez in or about June 2014, during the very first private offering, and told her she would be the primary person selling units for Eye Machine and that she would "always" be paid a 42.5% commission.

89. Defendants Pocklington and Eldred were also the sole signatories on Eye Machine's initial bank account, used between April 2014 and July 2015.

90. Pocklington and Eldred regularly reviewed Eye Machine's bank records, which reflected that during each of the first five offerings, Velazquez and Puleo had consistently been paid commissions equaling approximately 42.5% of what they raised for Eye Machine.

91. Although defendants Eldred and Walton have been signatories on Eye Machine's bank account since June 2015, Pocklington has still been the one who directs which payments are made out of the Eye Machine's bank account.

92. The PPMs further claimed that the net proceeds of investor funds would be used towards the development of the eye machine, including to pay for the costs of preparing, submitting and processing an application to the FDA for approval of the eye machine as a medical device, processing of the Company's patent application to the United States Office of Patents and Trademarks, developing trademarks and tradenames for the Company's planned products and filing applications for them with the United States Office of Patents and Trademarks, researching, designing and manufacturing new working prototypes of the eye machine, and manufacturing eye machines for leasing to medical professionals.

93. Contrary to the representations made to investors in the PPMs, defendants Eye Machine, AMC Holdings, Pocklington, Eldred, and Walton misappropriated approximately $681,587 of investor funds from Eye Machine's bank account, which were used to pay for the following undisclosed and unauthorized expenses:

| **Type of Expense** | **Approximate Amount Spent** |
|---|---|
| Payments To DTR Holdings | $164,295 |
| Cash Payments To Eva Pocklington | $127,771 |
| Payments To Cobra Chemical | $99,475 |
| Payments to Eva Pocklington's Personal Credit Card | $90,863 |
| Payments To Gold Star Resources | $68,446 |
| The Pocklingtons' Health Insurance and Fitness | $55,803 |
| The Pocklingtons' Personal Legal Expenses | $50,663 |
| Charitable And Political Donations | $14,351 |
| Flowers | $5,797 |
| Retail Purchases (Including Clothing and Furniture) | $4,123 |
| **Total** | **$681,587** |

94. Relief defendants Eva Pocklington, DTR Holdings, Cobra Chemical and Gold Star Resources each received money from Eye Machine:

(a) Eva Pocklington received approximately $127,771 in cash;

(b) DTR Holdings received approximately $164,295 in payments;

(c) Cobra Chemical received approximately $99,475 in payments; and,

(d) Gold Star Resources received approximately $68,446 in payments.

95. Relief defendants Eva Pocklington, DTR Holdings, Cobra Chemical and Goldstar Resources each had no legitimate claim to the money that each received from Eye Machine.

96. Eye Machine investors were not aware that their funds were being used for undisclosed purposes, including to pay undisclosed and excessive commissions, and for the Pocklingtons' personal expenses. Reasonable investors would have considered it important in their investment decision to know that their funds were being used for purposes other than what was stated in the PPMs.

97. The misrepresentations and omissions in the PPMs as to how investor funds would be used or spent were made by Pocklington, Eldred and Eye Machine.

98. Pocklington, Eye Machine and AMC Holdings each received money in the form of investors' investments, by means of the misleading statements in the PPMs regarding how investor funds would be spent.

99. Defendants Pocklington, Eldred, and Eye Machine knew, or were reckless in not knowing, that the PPMs contained misrepresentations and omissions regarding how investor funds would be used or spent. They also knew, or were reckless in not knowing, that investor funds were being misappropriated or misused, either for excessive commissions or, often, personal expenses, and that investors were being given a false appearance as to how their money was being spent.

100. In addition, defendants Pocklington, Eye Machine, and AMC Holdings

failed to exercise reasonable care when representing how investor funds would be used or spent in the PPMs, and thus were negligent. They also failed to exercise reasonable care when they misappropriated and misused the investor money.

101. Defendant Walton, a CPA who has held himself out as Eye Machine's CFO, negligently misappropriated and misused investor money and ignored red flags indicating Pocklington's and Eldred's questionable behavior.

102. For example, Walton was a signatory on one or more of Eye Machine's bank accounts and has admitted that he knew Eye Machine funds were being used to make payments directly to Eva Pocklington's personal credit card, and that he knew they had no legitimate business purpose and constituted "errors."

103. Walton also personally signed at least one of the checks used to make an improper payment to relief defendant Cobra Chemical.

104. Walton failed to act reasonably because he took no steps to determine whether the expenditures identified above were authorized under the PPMs. In fact, Walton admitted that the only portion of the PPMs he read was just one page having to do with the amounts owed to AMC Holdings.

105. Walton never read the other portions of the PPMs that explained how investor proceeds should have been spent.

106. Instead of questioning payments like those being made to Eva Pocklington's credit card, Walton incorrectly attributed these payments to the funds owed to AMC Holdings in his bookkeeping.

107. As a result, Walton acted negligently because he failed to exercise reasonable care and conform to the standard of care that would be exercised by a reasonable person in reviewing the PPM disclosures that were disseminated to Eye Machine investors.

### F. Defendants' Registration Violations

#### 1. Eye Machine's offer and sale of its units were not registered with the SEC

108. The units sold by Eye Machine were securities. Each investor invested money in a common enterprise, namely the development of the eye machine, with the expectation that any profits derived from its development would come solely through the effort of others.

109. As alleged above, the offers and sales of Eye Machine units were part of one integrated offering of securities. The six offers and sales that make up that offering, and the integrated offering itself, were never registered with the SEC. No registration statement was ever filed for the offer and sale of Eye Machine units, and no exemption from registration was, or is, available for their offer or sale.

110. Defendants Eye Machine, Pocklington, Eldred, Velazquez, Puleo, and Vanetten each directly or indirectly participated in the unregistered offer and sale of Eye Machine units to investors.

(a) Eye Machine, as the issuer of the securities, directly offered and sold the units in the unregistered offering.

(b) Pocklington offered and sold these units when he spoke to investors on investor conference calls and at in-person meetings. He also provided content for the PPMs.

(c) Velazquez spoke with investors individually, and Velazquez and Puleo spoke with investors on investor conference calls. Velazquez and Puleo also hired staff to contact and sell the units to potential investors. Velazquez also closed investors' transactions. Both Velazquez and Puleo earned sales commissions for selling units to investors.

(d) Vanetten offered and sold units directly to investors, earning sales commissions.

(e) Eldred indirectly offered and sold Eye Machine investments to

investors, because he provided content for the PPMs, reviewed and approved them, and was identified as Eye Machine's manager. He was therefore a necessary participant and a substantial factor in Eye Machine's offering.

111. Eye Machine's PPMs claimed that the offering was exempt from registration pursuant to Securities Act Section 4(2), Regulation D, Rule 506(c), which authorizes private offerings of unregistered securities to accredited investors when various conditions have been met.

112. As alleged above, Eye Machine publicly filed with the SEC nine Forms D and Forms D/A, Notice of Exempt Offerings, claiming that its offering was exempt from registration pursuant to Rule 506(c) under Regulation D. These forms certified that the offering was not disqualified from relying on Regulation D for any of the reasons stated in Rule 506(d) (the "bad actor" disqualification rule).

113. However, Rule 506(d) states that no exemption is available under the rule if, among other things, an individual is an executive officer, promoter, or a person that has been or will be paid (directly or indirectly) remuneration for soliciting investors who is subject to certain events, including: (1) any court judgment entered within five years before such sale of securities that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any securities law violations; (2) a final order of a state securities commission (or an agency or office of a state performing like functions) based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct and was entered within ten years before such sale of securities; or (3) an SEC order pursuant to Section 15(b) of the Exchange Act that bars such person from being associated with any entity such as a broker-dealer. If the disqualifying events occurred before the September 23, 2013 effective date of the bad actor disqualification rule, the issuer can still claim the exemption, but only if it furnishes to each investor, a reasonable time prior to sale, a description in writing of any matters that would have triggered disqualification.

114. The May 8, 2013 Arizona Corporation Commission cease and desist

order entered against Pocklington, which found that he had engaged in securities fraud with respect to two mining companies, triggered the bad actor disqualification rule and prevented Eye Machine's offering from being exempt pursuant to Rule 506(c) because the order was not disclosed in any of Eye Machine's PPMs until the sixth PPM in February 2017.

115. In addition, the SEC's 2005 order barring Velazquez from associating with a broker-dealer triggered the bad actor disqualification rule and prevented Eye Machine's offering from being exempt pursuant to Rule 506(c) because the order was not disclosed in any of Eye Machine's first five PPMs, during the time Velazquez offered and sold Eye Machine's units.

116. The December 2009 district court judgment against Velazquez for securities law violations also triggered the bad actor disqualification rule and prevented Eye Machine's offering from being exempt pursuant to Rule 506(c) because it was not disclosed in Eye Machine's April 2014 PPM.

117. Since Pocklington's and Velazquez's disqualifying events occurred before September 23, 2013, Eye Machine was required to fully disclose them to investors a reasonable time before selling Eye Machine securities.

118. Eye Machine lacked a reasonable basis for not knowing of the disqualifying events.

119. Pocklington admitted that he undertook no inquiry into Velazquez's background until several years after she began soliciting investors for Eye Machine.

120. In addition, in order to rely on the Regulation D, Rule 506(c) exemption, all of Eye Machine's investors had to be accredited, and Eye Machine was required to take reasonable steps to verify accreditation.

121. Eye Machine cannot rely on the Regulation D, Rule 506(c) exemption because not all of its investors were accredited.

**2. Defendants Velazquez, Puleo and Vanetten were unregistered brokers**

122. Between in or about June 2014 and in or about January 2017, defendants Velazquez and Puleo acted as unregistered brokers for Eye Machine.

123. Velazquez and Puleo raised approximately $11.1 million in investor money for Eye Machine, for which they received approximately $4,733,025 in commissions.

124. Velazquez and Puleo used their now defunct companies, which they owned and operated separately in Florida, to establish boiler rooms, and enlisted teams of sales agents to cold-call potential investors.

125. Velazquez and her company purchased lead lists for her sales agents to use.

126. Velazquez and Puleo each provided their sales agents with scripts of what to say to investors about Eye Machine.

127. Velazquez drafted the scripts used to solicit investors and would "close the deal" when an investor seemed interested in investing in Eye Machine.

128. Velazquez also invited investors to join a weekly conference call where Velazquez, Puleo, and Pocklington discussed Eye Machine and answered questions.

129. Velazquez and Puleo also created three password-protected websites that discussed Eye Machine.

130. Velazquez and Puleo did not qualify for any broker-dealer registration exemptions, because they received transaction-based compensation from Eye Machine in the form of sales commissions.

131. In or about June 2016, Velazquez and Puleo became "employees" of Eye Machine. Pocklington admitted that Velazquez and Puleo's "salary" was nothing more than an advance on the commissions they were expected to earn from raising money for Eye Machine, and that they would not have received additional advances unless they raised enough money to cover their last advance.

132. Between in or about March 2016 and in or about May 2017, defendant Vanetten acted as an unregistered broker for Eye Machine.

133. Vanetten raised at least $442,000 in investor money for Eye Machine, for which he received approximately $152,020 in commissions.

134. Neither Velazquez, Puleo nor Vanetten were registered as broker-dealers in accordance with Section 15(b) of the Exchange Act, nor were any of them associated with a registered broker-dealer, at the time that those sales took place.

**FIRST CLAIM FOR RELIEF**

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**

**(against Defendants Eye Machine, AMC Holdings, Pocklington, and Eldred)**

135. The SEC realleges and incorporates by reference paragraphs 1 through 134 above.

136. Defendants Eye Machine, AMC Holdings, Pocklington, and Eldred each defrauded investors by concealing Pocklington's control of Eye Machine, and by misappropriating and misusing investor funds when, in fact, they knew, or were reckless in not knowing, that defendant Pocklington, a convicted felon found to have committed securities fraud in the past, was the one controlling Eye Machine, and that investor funds were not being used in accordance with the PPMs. Defendants Eye Machine, AMC Holdings, Pocklington, and Eldred engaged in numerous deceptive acts to conceal this scheme, including authorizing and executing the transfer of funds, concealing Pocklington's full identity from investors during conference calls, creating outside companies and entities, and concealing information from their outside counsel.

137. By engaging in the conduct described above, defendants Eye Machine, AMC Holdings, Pocklington, and Eldred, and each of them, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national

securities exchange: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

138. By engaging in the conduct described above, defendants Eye Machine, AMC Holdings, Pocklington, and Eldred violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

139. Defendant Pocklington is a control person of Eye Machine, because he possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of Eye Machine. Accordingly, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), Pocklington is liable to the SEC to the same extent Eye Machine would be liable for its violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder.

**SECOND CLAIM FOR RELIEF**

**Fraud in the Offer or Sale of Securities**

**Violations of Sections 17(a)(1) and (3) of the Securities Act**

**(against Defendants Eye Machine, AMC Holdings, Pocklington, and Eldred)**

140. The SEC realleges and incorporates by reference paragraphs 1 through 134 above.

141. Defendants Eye Machine, AMC Holdings, Pocklington, and Eldred each defrauded investors by concealing Pocklington's control of Eye Machine, and by misappropriating and misusing investor funds when, in fact, they knew, or were reckless or negligent in not knowing, that defendant Pocklington, a convicted felon found to have committed securities fraud in the past, was the one controlling Eye Machine, and that investor funds were not being used in accordance with the PPMs. Defendants Eye Machine, AMC Holdings, Pocklington, and Eldred engaged in numerous deceptive acts to conceal this scheme, including authorizing and executing the transfer of funds, concealing Pocklington's full identity from investors during

conference calls, creating outside companies and entities, and concealing information from their outside counsel.

142. By engaging in the conduct described above, defendants Eye Machine, AMC Holdings, Pocklington, and Eldred, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

143. By engaging in the conduct described above, defendants Eye Machine, AMC Holdings, Pocklington, and Eldred violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

**THIRD CLAIM FOR RELIEF**

**Fraud in the Offer or Sale of Securities**

**Violations of Section 17(a)(3) of the Securities Act**

**(against Defendant Walton)**

144. The SEC realleges and incorporates by reference paragraphs 1 through 134 above.

145. Defendant Walton negligently engaged in conduct that operated as a fraud and deceit upon the investors in defendant Eye Machine when he took no steps to determine whether certain expenditures of investor funds were permitted under the PPMs, failed to read those portions of the PPMs that explained how investor proceeds were supposed to be spent, signed the check for at least one of the improper payments to relief defendant Cobra Chemical himself, and improperly accounted for the payments made on Eva Pocklington's personal credit card, even though he knew or should have known there was no legitimate business purpose for the payments and that they constituted errors.

146. By engaging in the conduct described above, defendant Walton, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly, negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

147. By engaging in the conduct described above, defendant Walton violated, and unless restrained and enjoined will continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

**FOURTH CLAIM FOR RELIEF**

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**

**(against Defendants Eye Machine, Pocklington, and Eldred)**

148. The SEC realleges and incorporates by reference paragraphs 1 through 134 above.

149. Defendants Eye Machine, Pocklington, and Eldred made material misrepresentations and omissions to investors by claiming that Eldred would be the sole person managing the day-to-day operations of Eye Machine when, in fact, they knew, or were reckless in not knowing, that the company was also being controlled by Pocklington, a convicted felon whom the Arizona Corporation Commission had recently sanctioned for securities fraud; and by claiming that investor funds would be spent in accordance with the terms contained in the PPMs when, in fact, they knew, or were reckless in not knowing, that investor funds were being spent on things not disclosed in the PPMs, including to pay undisclosed and excessive commissions and to pay Pocklington's and Eva Pocklington's personal expenses.

150. By engaging in the conduct described above, defendants Eye Machine, Pocklington, and Eldred, each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, made

untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

151. By engaging in the conduct described above, defendants Eye Machine, Pocklington, and Eldred violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

152. Defendant Pocklington is a control person of Eye Machine, because he possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of Eye Machine. Accordingly, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), Pocklington is liable to the SEC to same extent Eye Machine would be liable for its violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

**FIFTH CLAIM FOR RELIEF**

**Fraud in the Offer or Sale of Securities**

**Violations of Section 17(a)(2) of the Securities Act**

**(against Defendants Eye Machine, AMC Holdings, and Pocklington)**

153. The SEC realleges and incorporates by reference paragraphs 1 through 134 above.

154. Defendants Eye Machine, AMC Holdings, and Pocklington raised approximately $14 million from investors by making material misrepresentations and omissions to investors by claiming that Eldred would be the sole person managing the day-to-day operations of Eye Machine when, in fact, they knew, or were reckless or negligent in not knowing, that the company was also being controlled by Pocklington, a convicted felon whom the Arizona Corporation Commission had recently sanctioned for securities fraud; and by claiming that investor funds would be spent in accordance with the terms contained in the PPMs when, in fact, they knew, or were reckless or negligent in not knowing, that investor funds were being spent on things

not disclosed in the PPMs, including to pay undisclosed and excessive commissions and to pay Pocklington's and Eva Pocklington's personal expenses.

155. By engaging in the conduct described above, defendants Eye Machine, AMC Holdings, and Pocklington, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

156. By engaging in the conduct described above, defendants Eye Machine, AMC Holdings, and Pocklington violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, and Rule 10b-5 (against Defendants Pocklington and Eldred)

157. The SEC realleges and incorporates by reference paragraphs 1 through 134 above.

158. Defendants Pocklington and Eldred aided and abetted defendant Eye Machine's scheme to defraud and its material misrepresentations to investors. By helping draft the PPMs used in the offerings, concealing information from investors and their outside counsel, misusing and misappropriating investor funds, and creating various documents and entities designed to conceal defendant Pocklington's involvement in the offering, Pocklington and Eldred knowingly or recklessly provided substantial assistance in Eye Machine's violations.

159. By reason of the conduct described above, defendants Pocklington and Eldred, pursuant to Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b) and

Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), knowingly and recklessly provided substantial assistance to, and thereby aided and abetted defendant Eye Machine in its primary violations of Section 17(a) of the Securities Act, 15 U.S.C. §§ 77e, 77q, and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**SEVENTH CLAIM FOR RELIEF**

**Unregistered Offer and Sale of Securities**

**Violations of Sections 5(a) and 5(c) of the Securities Act**

**(against Defendants Eye Machine, Pocklington, Eldred, Velazquez, Puleo, and Vanetten)**

160. The SEC realleges and incorporates by reference paragraphs 1 through 134 above.

161. Eye Machine’s offering was never registered with the SEC, and no exemption from registration applied.

162. By engaging in the conduct described above, defendants Eye Machine, Pocklington, Eldred, Velazquez, Puleo, and Vanetten, and each of them, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

163. Defendants Eye Machine, Pocklington, Velazquez, Puleo and Vanetten directly offered and sold Eye Machine’s securities.

164. Defendant Eldred indirectly offered and sold Eye Machine’s securities and was a necessary participant and a substantial factor in Eye Machine’s offers and sales.

165. By engaging in the conduct described above, defendants Eye Machine, Pocklington, Eldred, Velazquez, Puleo, and Vanetten have violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c), 15 U.S.C. §§ 77e(a) & 77e(c).

**EIGHTH CLAIM FOR RELIEF**

**Unregistered Broker-Dealer**

**Violation of Section 15(a) of the Exchange Act**

**(against Defendants Velazquez, Puleo, and Vanetten)**

166. The SEC realleges and incorporates by reference paragraphs 1 through 134 above.

167. Defendants Velazquez, Puleo, and Vanetten acted as unregistered brokers by, among other things, offering and agreeing to provide broker-dealer services in exchange for transaction-based compensation, including a percentage of funds raised, without being registered with the SEC.

168. By engaging in the conduct described above, defendants Velazquez, Puleo, and Vanetten, and each of them, made use of the mails and means or instrumentalities of interstate commerce to effect transactions in, and induced and attempted to induce the purchase or sale of, securities (other than exempted securities or commercial paper, bankers' acceptances, or commercial bills) without being registered with the SEC in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b), and without complying with any exemptions promulgated pursuant to Section 15(a)(2), 15 U.S.C. § 78o(a)(2).

169. By engaging in the conduct described above, defendants Velazquez, Puleo, and Vanetten have violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

**NINTH CLAIM FOR RELIEF**

**Violating An Existing Broker-Dealer Bar**

**Violation of Section 15(b)(6)(B)(i) of the Exchange Act**

**(against Defendant Velazquez)**

170. The SEC realleges and incorporates by reference paragraphs 1 through 134 above.

171. During the entire time defendant Velazquez was offering and providing broker-dealer services to defendant Eye Machine in exchange for transaction-based compensation, including a percentage of funds raised, an order under Section 15(b)(6)(A) of the Exchange Act was in effect with respect to Velazquez that had been issued on or about March 18, 2005, permanently barring Velazquez from associating with a broker or dealer.

172. By engaging in the conduct described above, defendant Velazquez made use of the mails and means or instrumentalities of interstate commerce to effect transactions in, and induced and attempted to induce the purchase or sale of, securities in contravention of an order still in effect barring her from associating with any broker-dealer without the consent of the SEC.

173. By engaging in the conduct described above, defendant Velazquez has violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Section 15(b)(6)(B)(i) of the Exchange Act, 15 U.S.C. § 78o(b)(6)(B)(i).

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

**II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure:

(a) permanently enjoining defendants Eye Machine, AMC Holdings, Pocklington, and Eldred, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 17(a)(1) and (3) of the Securities Act 15 U.S.C. §77q(a), and Section 10(b) of the Exchange Act 15 U.S.C. §§ 78j(b) and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5;

(b) permanently enjoining defendant Walton and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a)(3) of the Securities Act, 15 U.S.C. 77q(a)(3);

(c) permanently enjoining defendants Eye Machine, AMC Holdings, and Pocklington, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a)(2) of the Securities Act 15 U.S.C. §77q(a)(2),

(d) permanently enjoining Eye Machine, Pocklington, and Eldred and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act 15 U.S.C. §§ 78j(b) and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b);

(e) permanently enjoining defendants Pocklington and Eldred, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating 17(a) of the Securities Act 15 U.S.C. §77q(a), and Section 10(b) of the Exchange Act 15 U.S.C.

§§ 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, as aiders and abettors under Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b), and Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e); and

(f) permanently enjoining defendant Pocklington, and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 24010b-5, as a control person under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

**III.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendants Eye Machine, Pocklington, Eldred, Velazquez, Puleo, Vanetten and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act 15 U.S.C. §§ 77e(a), 77e(c).

**IV.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendants Velazquez, Puleo, Vanetten, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 15(a) of the Exchange Act 15 U.S.C. §§ 78o(a).

**V.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendant Velazquez and her officers, agents, servants, employees and attorneys, and those persons in active concert or

participation with her, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 15(b)(6)(B)(i) of the Exchange Act 15 U.S.C. §§ 78o(b)(6)(B)(i).

**VI.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Pocklington from directly or indirectly, including, but not limited to, through any entity owned or controlled by Pocklington, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by an issuer.

**VII.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Velazquez from directly or indirectly, including, but not limited to, through any entity owned or controlled by Velazquez, soliciting any person or entity to purchase or sell any security in an unregistered offering by an issuer.

**VIII.**

Order the defendants Pocklington, Velazquez, Puleo, and Vanetten and all the relief defendants to disgorge all ill-gotten gains, together with prejudgment interest thereon.

**IX.**

Order the defendants AMC Holdings, Pocklington, Eldred, Walton, Velazquez, Puleo and Vanetten to pay civil penalties under Section 20(d) of the Securities Act 15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3).

**X.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**XI.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: October 17, 2018

*/s/ Douglas M. Miller*
DOUGLAS M. MILLER
Attorney for Plaintiff
Securities and Exchange Commission

# PROOF OF SERVICE

I am over the age of 18 years and not a party to this action. My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On October 17, 2018, I caused to be served the document entitled **SECOND AMENDED COMPLAINT** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:** By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:** I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:** By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐ **ELECTRONIC MAIL:** By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:** By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date: October 17, 2018

*/s/ Douglas M. Miller*
Douglas M. Miller

***SEC v. Peter H. Pocklington, etc. et al***
**United States District Court—Central District of California**
**Case No.** 5:18-cv-00701-JGB-SP

**SERVICE LIST**

Becky S. James, Esq. **(served by CM/ECF only)**
Jaya C. Gupta, Esq. **(served by CM/ECF only)**
Rachael A. Robinson, Esq. **(served by CM/ECF only)**
James & Associates
23564 Calabasas Road, Suite 201
Calabasas, CA 91302
Email: bjames@jamesaa.com
jgupta@jamesaa.com
rrobinson@jamesaa.com
***Attorneys for Defendants Peter H. Pocklington, Terrence J. Walton, Robert A. Vanetten, Nova Oculus Partners, LLC (f/k/a the Eye Machine, LLC), AMC Holdings, LLC and Relief Defendants Eva S. Pocklington, DTR Holdings, LLC, Cobra Chemical, LLC, and Gold Star Resources, LLC***

Michael P. McCloskey, Esq. **(served by CM/ECF only)**
Wilson, Elser, Moskowitz, Edleman and Dicker
401 W. A Street, Suite 1900
San Diego, CA 92101-7908
Email: michael.mccloskey@wilsonelser.com
***Attorneys for Defendant Lantson E. Eldred***

Sam Y. Edgerton, III **(served by CM/ECFonly)**
Johnny Lee Antwiler, II **(served by CM/ECF only)**
Freeman Mathis & Gary, LLP
2615 Pacific Coast Highway, Suite 300
Hermosa Beach, CA 90254
Email: sedgerton@fmglaw.com
jantwiler@fmglaw.com
***Attorneys for Defendants Yolanda Velazquez and Vanessa Puleo***