Becky S. James (SBN 151419)
Jaya C. Gupta (SBN 312138)
Rachael A. Robinson (SBN 313991)
JAMES & ASSOCIATES
23564 Calabasas Road, Suite #201
Calabasas, CA 91302
Telephone: (310) 492-5704
Facsimile: (888) 711-7103

Attorneys for Defendants Peter H.
Pocklington, Terrence J. Walton, Robert
Vanetten, Nova Oculus Partners, LLC
f/k/a The Eye Machine, LLC, and AMC
Holdings LLC, and Relief Defendants Eva
S. Pocklington, DTR Holdings, LLC,
Cobra Chemical, LLC and Gold Star
Resources, LLC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>PETER H. POCKLINGTON, LANTSON ELDRED, TERRENCE J. WALTON, YOLANDA C. VELAZQUEZ a/k/a LANA VELAZQUEZ a/k/a LANA PULEO, VANESSA PULEO, ROBERT VANETTEN, NOVA OCULUS PARTNERS, LLC, f/k/a THE EYE MACHINE, LLC, and AMC HOLDINGS, LLC,<br><br>　　　　　Defendants,<br><br>EVA S. POCKLINGTON, DTR HOLDINGS, LLC, COBRA CHEMICAL, LLC, and GOLD STAR RESOURCES, LLC.<br><br>　　　　　Relief Defendants. | Case No. 5:18-cv-00701-JGB<br><br>NOTICE OF MOTION AND MOTION BY DEFENDANT TERRENCE WALTON TO DISMISS CLAIM THREE OF SECOND AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES<br><br>[PROPOSED] ORDER<br><br>Date:　December 3, 2018<br>Time:　9:00 a.m.<br>Court:　Courtroom 1<br>　　　　Honorable Jesus G. Bernal |

**TO THE COURT, THE PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on Monday, December 3, 2018, at 9:00 a.m., or as soon as this motion may be heard in Courtroom 1, located at the George H. Brown Jr. Federal Building and United States Courthouse, 3470 Twelfth Street, Riverside CA 92501-3801, by the Honorable Jesus G. Bernal, or any person sitting in his stead, Defendant Terrence Walton will move to dismiss the claim made against him in the Second Amended Complaint filed by the Securities and Exchange Commission (the "SEC"), pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]

This motion is based on this Notice and Motion and accompanying Memorandum of Points of Authorities, and such additional matter as may properly be brought before the Court at or before the hearing of this motion.

DATED:  October 31, 2018          JAMES & ASSOCIATES


                                            By:      /s/ Becky S. James
                                                     Becky S. James

                                            Attorneys for Defendants Peter H. Pocklington, Terrence J. Walton, Robert Vanetten, Nova Oculus Partners, LLC f/k/a The Eye Machine, LLC, and AMC Holdings LLC, and Relief Defendants Eva S. Pocklington, DTR Holdings, LLC, Cobra Chemical, LLC and Gold Star Resources, LLC

---

[1] In accordance with Local Rule 7-3, the parties to this action met and conferred on October 23, 2018, more than seven (7) days prior to the filing deadline.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Despite getting another bite at the proverbial apple, the SEC, once again, fails to allege a sufficient claim against Defendant Terrence J. Walton. The sole claim alleged against Defendant Walton is a negligent violation of Section 17(a)(3) of the Securities Act of 1933 (the "Securities Act"). This Court previously dismissed this claim against Defendant Walton as failing to adequately state a claim under Fed. R. Civ. P. 12(b)(6), but granted the SEC leave to amend. While the SEC has now amended its complaint to clarify that it seeks to impose liability under a general negligence standard, not a heightened standard based on Defendant Walton's status as an accountant, the SEC has not cured, nor can it cure, the fundamental defects in its claim against Defendant Walton.

First, the Second Amended Complaint ("SAC") fails to identify any duty Defendant Walton had not to engage in the conduct for which the SEC alleges liability or to explain how his acts or omission breached any such duty. Though not articulated, the gist of the SEC's theory seems to be that Defendant Walton, who performed bookkeeping functions for the Eye Machine, should have overridden management decisions about certain expenditures of funds. Yet, the PPMs did not impose any such duty on Defendant Walton, and in fact, the Ninth Circuit has expressly rejected the SEC's efforts to impose upon an accountant a legal duty to act as "an insurer of his client's honesty and an enforcement arm of the SEC." *SEC v. Arthur Young & Co.*, 590 F.2d 785, 788 (9th Cir. 1979). Without establishing any breach of a legal duty, the SAC fails to allege a claim of negligence under Section 17(a)(3).

Second, the SAC fails to plead sufficient facts to establish that Defendant Walton's alleged conduct operated or would operate as a fraud or deceit upon investors, as required by Section 17(a)(3). To be actionable, Defendant Walton's

conduct must itself have had the purpose and effect of creating a false appearance of fact. The SEC does not allege, nor could it, that Defendant Walton created false reports or provided false information to investors. Instead, as admitted by the SEC, Defendant Walton's bookkeeping actually attributed the challenged expenditures to majority member AMC Holdings. Far from concealing or perpetrating a fraud, Defendant Walton's bookkeeping in fact made clear that those expenditures were not for business purposes and required AMC Holdings to absorb their cost out of the amount of compensation it was entitled to receive under the PPMs.

Without any additional allegations articulating Defendant Walton's duty not to engage in the acts the SEC complains of, and without any allegations setting forth how his conduct operated as a fraud, the SAC once again fails to sufficiently state a claim against Defendant Walton. Because it is clear that such deficiencies cannot be cured, the claim against Defendant Walton must be dismissed without leave to amend.

## STATEMENT OF FACTS

### I.   Eye Machine Background

After receiving a diagnosis of age-related macular degeneration ("AMD"), Defendant Peter Pocklington, founded the Eye Machine LLC (now known as Nova Oculus Partners LLC) in January 2014 to develop, manufacture, and lease to medical professionals a biomedical device designed to treat AMD and other forms of eye diseases. (SAC at ¶¶ 5, 38; *see also* Ex. 1 at 1, 3.)[2] AMD is the leading cause of severe and irreversible vision loss in the developed world, yet the treatments are aimed at slowing the progression of the disease and few restore vision. (Ex. 1 at 4.)

---

[2] "SAC" refers to the Second Amended Complaint filed by the SEC on October 17, 2018 at Docket No. 47.  Ex. 1 refers to Exhibit 1, a Private Placement Memorandum issued by Defendant Nova Oculus Partners LLC, attached to Defendants' original Motion to Dismiss filed on July 5, 2018 as Docket No. 27.

Currently, there are no FDA-approved treatments for the most common form of AMD. (Ex. 1 at 4.)

The Eye Machine's focus has been on creating an FDA approved device using innovative and non-invasive BioCurrent therapy to treat all forms of AMD. (Ex. 1 at 4.) Since its founding, the Eye Machine has made great progress in the development of its device to treat macular degeneration, including submitting patent applications with the United States Patent and Trademark Office ("USPTO") for its device. (Ex. 1 at 1.)

## II.   Eye Machine Private Offerings

To raise money for research and development, the Eye Machine began to make private offerings to accredited investors through PPMs. (SAC at ¶¶ 41-42, 46.) The PPMs expressly delineated certain categories of expenditures the company expected to make, including not only research and development, but marketing and other expenses. (Ex. 1 at 2.) The PPMs also stated, however, that "the Company reserves the right to use the funds obtained from this offering for similar purposes not presently contemplated which the Manager deems to be in the best interest of [The Eye Machine] and its Members in order to address changed circumstances or opportunities." (Ex. 1 at 14.) The PPMs also provided that "[u]nder the Company's Operating Agreement, the Manager is given the exclusive authority to manage the Company's business." (Ex. 1 at 14; *see also* Ex. 1 at A-5 (Operating Agreement).) At all relevant times, Defendant Lanston Eldred was the Manager of the Eye Machine. (SAC at ¶ 56; *see also* Ex. 1 at A-3.) The PPMs did not name Defendant Walton, nor did they delineate any duties to be performed by Mr. Walton or any other accountant or financial officer.

The PPMs also set forth fees that would be paid to the Majority Member, AMC Holdings LLC ("AMC"). In particular, the PPMs expressly stated that AMC would receive a "one-time management administration fee equal to approximately

7% of the gross proceeds of this offering to cover certain administrative costs incurred by the Company on a non-accountable basis." (Ex. 1 at 20.) The PPMs further provided that "[t]he Company is authorized to pay to the Majority Member a consulting fee up to $25,000 per month for consulting services rendered."[3] (Ex. 1 at 20.)

## III.   SEC Investigation and Complaint

On November 2, 2016, the SEC issued a formal order instituting an investigation. On April 5, 2018, the SEC filed its original Complaint in the instant matter. The Complaint alleged violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b), and (c); violations of Sections 17(a)(1), (2), and (3); violations of Sections 5(a) and 5(c) of the Securities Act; violations of Section 15(a) of the Exchange Act and violation of Section 15(b)(6)(B)(i) of the Exchange Act.

On July 5, 2018, Defendants filed motions to dismiss the SEC's claims under Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c) and Sections 17(a)(1)-(3) of the Securities Act. On September 10, 2018, after hearing argument, the Court partially granted and partially denied Defendants' motions to dismiss, dismissing the Section 10(b) and Rule 10b-5(b) claim against Defendant Eldred and the Section 17(a)(3) claim against Defendant Walton with leave to amend, and sustaining the remainder of the SEC's claims challenged by Defendants.

On October 1, 2018, the SEC filed its First Amended Complaint ("FAC") again asserting the claims (including Count 3 against Defendant Walton) dismissed by the Court on September 10, 2018. On October 17, with leave of court, the SEC filed a Second Amended Complaint again asserting the claims (including Claim 3) dismissed by this Court on September 10, 2018.  Claim 3, alleging a violation of

---

[3] In some of the PPMs, the monthly compensation amount was reduced to $15,000, but in all of the offerings, AMC Holdings was entitled to both the 7% management administration fee and the monthly compensation amount.

Section 17(a)(3) by Defendant Walton, is the only claim in which Defendant Walton is named and is the subject of the instant motion. (*See* SAC at ¶¶144-147.)

The SAC alleges that "Defendant Terrence J. Walton ('Walton'), who held himself out as Eye Machine's CFO, performed bookkeeping functions for the company. Walton failed to act reasonably in that he took no steps to determine whether Pocklington and Eldred's use of investor funds were authorized under the PPM." (SAC at ¶ 8.) The SAC identified payments to Eva Pocklington's personal credit card and to Cobra Chemical (SAC at ¶¶ 102, 103) and alleged that Defendant Walton "failed to act reasonably because he took no steps to determine whether the expenditures identified above were authorized under the PPMs" (SAC at ¶ 104). The SAC also alleges that "[i]nstead of questioning payments like those being made to Eva Pocklington's credit card, Walton incorrectly attributed these payments to the funds owed to AMC Holdings in his bookkeeping." (SAC at ¶ 106.) "As a result," the SAC alleges, "Walton acted negligently because he failed to exercise reasonable care and conform to the standard of care that would be exercised by a reasonable person in reviewing the PPM disclosures that were disseminated to Eye Machine investors." (SAC at ¶ 107.) The SAC concludes that, through these acts and omissions, "Defendant Walton negligently engaged in conduct that operated as a fraud and deceit upon the investors in defendant Eye Machine" and "negligently engaged in transactions, practices, or courses or business which operated or would operate as a fraud or deceit upon the purchaser." (SAC at ¶¶ 146, 147.)

## LEGAL STANDARD

A complaint must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) if it fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6); *Scott v. ZST Digital Networks, Inc.*, 896 F. Supp. 2d 877, 881 (C.D. Cal. 2012); *see also SmileCare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996). Dismissal under Rule 12(b)(6) is warranted when the

1  plaintiff has either failed to plead a cognizable legal theory or has failed to plead

2  sufficient facts under a cognizable legal theory. *Scott*, 896 F. Supp. 2d at 881.

3      To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain

4  sufficient factual matter, accepted as true, to state a claim to relief that is plausible

5  on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations

6  omitted). A claim is facially plausible when the facts pleaded "allow[] the court to

7  draw the reasonable inference that the defendant is liable for the misconduct

8  alleged." *Id.* A complaint which "pleads facts that are 'merely consistent with' a

9  defendant's liability . . . 'stops short of the line between possibility and plausibility

10 of entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557

11 (2007) (internal quotations omitted)).

12     In evaluating a complaint's sufficiency under these standards, the court must

13 first "tak[e] note of the elements a plaintiff must plead to state a claim." *Iqbal*, 556

14 U.S. at 675. Next, the court should "identify allegations that, 'because they are no

15 more than conclusions, are not entitled to the assumption of truth.'" *Iqbal*, 556 U.S.

16 at 679; *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1031 (9th Cir. 2016)

17 ("mere legal conclusions are not entitled to an assumption of truth."). Finally, where

18 the allegations are well-pled, the court "should assume their veracity and then

19 determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556

20 U.S. at 679. A court, however, should not accept as true "allegations that are merely

21 conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re*

22 *Gilead Scis. Sec. Litig.,* 536 F.3d 1049, 1055 (9th Cir. 2008).

23     Claims alleging securities fraud, including claims brought under Section 17(a)

24 of the 1933 Securities Act, 15 U.S.C. § 77q(a), are subject to the heightened

25 pleading standards of Federal Rule of Civil Procedure 9(b), which requires a party to

26 "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b);

27 *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985) (recognizing that the

28

particularity requirement of Rule 9(b) applies to Section 17(a) claims); *SEC v. Power*, 525 F.Supp.2d 415 (S.D.N.Y. 2007) (applying Rule 9(b) to Section 17(a)(2) and (3) claims).  In essence, "a plaintiffs' complaint must identify the who, what, when, where, and how of the misconduct alleged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *SEC v. Bardman*, 216 F. Supp. 3d 1041, 1050 (N.D. Cal. 2016) (quoting *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013)).

## ARGUMENT

The SEC has failed to adequately plead its claim under Section 17(a)(3) of the Securities Act of 1933 (the "Securities Act") against Defendant Walton.  Section 17(a)(3) makes it unlawful for any person in the offer or sale of securities to "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(3); *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980). Claims under Section 17(a)(3) require a showing of negligence.  *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001).

Here, the SEC has failed to adequately plead that Defendant Walton acted negligently when he engaged in the alleged acts and/or omissions that the SEC complains of. The SEC has also failed to adequately plead that any of Defendant Walton's alleged acts and/or omissions operated or would operate as a fraud or deceit upon purchasers of Eye Machine securities. As discussed in detail below, given these fundamental and incurable deficiencies in the SEC's pleading, this Court should grant this motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) without further leave to amend.

## I.   The SEC Has Failed to State a Section 17(a)(3) Claim Against Defendant Walton

The SEC once again alleges that Defendant Walton violated Section 17(a)(3), based on slightly modified allegations that:

-7-

Defendant Walton negligently engaged in conduct that operated as a fraud and deceit upon the investors in defendant Eye Machine when he took no steps to determine whether certain expenditures of investor funds were permitted under the PPMs, failed to read those portions of the PPMs that explained how investor proceeds were supposed to be spent, signed the check for at least one of the improper payments to relief defendant Cobra Chemical himself, and improperly accounted for the payments made on Eva Pocklington's personal credit card, even though he knew or should have known there was no legitimate business purpose for the payments and that they constituted errors.

(SAC at ¶ 145; *see also* SAC at ¶¶ 101-107.)

In response to the Court's previous order, the SEC elected to remove language suggesting that Defendant Walton's liability might arise from a heightened standard of care placed upon him as an accountant. (Compare Compl. at ¶ 137 with SAC at ¶ 145 (removing phrase that Defendant Walton acted "as a CPA who has held himself out as the chief financial officer of defendant Eye Machine").) Thus, the SEC has apparently abandoned any effort to rely upon a professional standard of care and instead now limits its theory to one of simple negligence. This, however, does nothing to cure the fundamental defect in the SEC's claim because the SEC fails to identify any duty that Defendant Walton had not to engage in the conduct alleged, or to identify how Defendant's Walton's alleged conduct operated as a fraud or deceit upon investors.

### A. The SEC Has Failed to Allege Any Duty on the Part of Defendant Walton to Engage or Not to Engage in the Acts and Omissions Complained of

It is well-established that violations of Section 17(a)(3) of the Securities Act require a showing of negligence. *See, e.g., Dain Rauscher, Inc.*, 254 F.3d at 856. For "negligence" to occur, there must be a breach of a legal duty. *See, e.g., Hayes v. County of San Diego*, 736 F.3d 1223, 1231 (9th Cir. 2013) ("a plaintiff must establish the standard elements of negligence: defendants owed a duty of care; defendants breached their duty; and defendants' breach caused plaintiff's injury....While breach of duty and proximate cause normally present factual questions, the existence of a legal duty in a given factual scenario is a question of

-8-

law for the courts to determine."); *see also Delta Savings Bank v. United States,* 265 F.3d 1017, 1026 (9th Cir. 2001) (to make out a claim of negligence, "a duty must be identified,… The duty must arise from state statutory or decisional law, and must impose on the defendants a duty to refrain from committing the sort of wrong alleged here.").

Thus, the SEC must come forward and allege that the defendant had a duty to act or not to act, which duty was breached by the alleged conduct. *See Dain Rauscher, Inc.*, 254 F.3d at 857-58; *SEC v. Shanahan*, 646 F.3d 536, 545-46 (8th Cir. 2011); *see also Arthur Young*, 590 F.2d at 788 ("…the elements of fraud if charged must be pleaded with particularity to show a fraudulent breach of duty.") (quoting *SEC v. Republic Nat. Life Ins. Co.*, 378 F. Supp. 430, 440 (S.D.N.Y. 1974)); *Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003) ("The Commission correctly determined that the petitioners had a duty to disclose any potential conflicts of interest accurately and completely[.]").

Having disavowed reliance on Defendant's Walton's status as an accountant, the SEC does not and cannot rely on any special duties imposed upon accountants, or on Defendant Walton supposedly having fallen below a professional standard of care. *Cf. Dain Rauscher*, 254 F.3d at 857-58 (noting that as a "securities professional," the defendant "had a duty to make an investigation that would provide him with a reasonable basis for a belief that the key representations in the statements were truthful and complete").

Rather, having chosen to rely on the lower "reasonable person" standard, it was incumbent upon the SEC to articulate the duty Defendant Walton had and a plausible explanation for how Defendant Walton breached any such duty. For example, in *SEC v. Shanahan*, 646 F.3d at 546, the Eighth Circuit affirmed the grant of judgment as a matter of law in favor of the defendant for a violation of Section 17(a)(2) and (3), where the SEC failed to present any evidence as to which duty the

defendant board member had or how his conduct fell below the standard of care.  In so holding, the Eighth Circuit adopted the district court's analysis:

> Finally, and perhaps most importantly, the SEC offered absolutely no evidence regarding Mr. Shanahan, Jr.'s duties as a member of ESSI's Board of Directors and as a member of the Compensation Committee. Absent this basic framework, once again, the Jury would be left to speculate as to whether a duty existed on the part of Mr. Shanahan Jr., and, if it did, whether he failed to perform that duty.

*Shanahan*, 646 F.3d at 546.

The SEC has alleged no facts supporting a duty on the part of Defendant Walton to review investor documents to ensure that expenditures comported with disclosures regarding how investor funds should be spent, or to contravene the authority of others—including the person (Pocklington) the SEC alleges was the control person of the Eye Machine (SAC at ¶ 59)—and refuse to make a payment when he believed such payments to be illegitimate. The PPMs imposed no such duty on Defendant Walton; indeed, they never even mentioned Defendant Walton or any duties of the part of the Company's accountant, bookkeeper or CFO. To the contrary, the PPMs made clear that "the Manager is given the exclusive authority to manage the Company's business." (Ex. 1 at 14, A-5.)

Nor can any such duty be found in the law, as the Ninth Circuit has expressly rejected imposing such a duty on accountants. In *Arthur Young*, the SEC sued Arthur Young, an auditing firm, for, among other things, violating and aiding and abetting the violations of Section 17(a), and Section 10b and Rule 10b-5, alleging that its auditors "should have done 'more' to reveal to investors the conduct of [an oil and gas venture promoter] and his associates that increased the financial risk of those who invested in his ventures." 590 F.2d at 786-87. The SEC specifically sought an injunction enjoining Arthur Young and its auditors from any future violations of securities laws. *Id*. Affirming the denial of the injunction, the Ninth Circuit rejected the SEC's contention that the proper standard was whether:

> [T]he accountant performed his audit functions in a manner that would

-10-

1
2

have revealed to an ordinary prudent investor, who examined the accountant's audits or other financial statements, a reasonably accurate reflection of the financial risks such an investor presently bears or might bear in the future if he invested in the audited endeavor.

3 *Id.* at 787-88. The court went on to explain:

4
5
6
7
8
9

To accept the SEC's position would go far toward making the accountant both an insurer of his client's honesty and an enforcement arm of the SEC. We can understand why the SEC wishes to so conscript accountants. Its frequently late arrival on the scene of fraud and violations of securities laws almost always suggests that had it been there earlier With [sic] the accountant it would have caught the scent of wrong-doing and, after an unrelenting hunt, bagged the game. What it cannot do, the thought goes, the accountant can and should. The difficulty with this is that Congress has not enacted the conscription bill that the SEC seeks to have us fashion and fix as an interpretive gloss on existing securities laws.

10 *Id.* at 788.

11       Here, the SEC's theory of liability under Section 17(a) fails, as it is the same

12 theory of liability that the Ninth Circuit rejected in *Arthur Young* – namely that

13 Defendant Walton should have "done more" to question and prevent the

14 expenditures of investor funds, which by the SEC's own admission, were directed to

15 be paid by others in the Company. (*See* SAC at ¶¶ 8, 91.) By alleging that Defendant

16 Walton "failed to act reasonably because he took no steps to determine whether the

17 expenditures identified…were authorized by the PPMs" (SAC at ¶ 104), the SEC

18 tries to make Defendant Walton, Eye Machine's accountant/bookkeeper, "both an

19 insurer of his client's honesty and an enforcement arm of the SEC." This is clearly

20 impermissible under Ninth Circuit precedent.

21       Even the SAC's strikingly sparse allegations of specific conduct fail to

22 identify any duty Defendant Walton breached. As to Defendant Walton's signature

23 on a single check to Cobra Chemical, the SAC does not allege that Defendant

24 Walton had the authority to or did make the decision how funds were to be spent. To

25 the contrary, the SAC expressly alleges that, even after Defendant Walton became a

26 signatory in either June or July 2015,[4] Defendant Pocklington "has still been the one

27
28

_____

[4] The Second Amended Complaint is unclear as to whether Defendant Walton

1  who directs which payments are made out of the Eye Machine's bank account."

2  (SAC at ¶¶ 89, 91; *see also* SAC at ¶ 8 ("Walton failed to act reasonably in that he

3  took no steps to determine whether *Pocklington's and Eldred's use* of investor funds

4  were authorized under the PPMs." (emphasis supplied)).)

5      Elsewhere, the SEC alleges that "[i]nstead of questioning payments like those

6  being made to Eva Pocklington's credit card, Walton *incorrectly attributed* these

7  payments to the funds owed to AMC Holdings in his bookkeeping." (SAC at ¶ 106

8  (emphasis supplied).) In addition to failing to state which duty Defendant Walton

9  had to "question[]" payments directed by others, this allegation presupposes that

10  there is a "correct" way to attribute such payments. The SEC, however, has failed to

11  allege what is this "correct" method of attributing such payments. Later, the SEC

12  again alleges that Defendant Walton "improperly accounted for the payments made

13  on Eva Pocklington's personal credit card[,]" (SAC at ¶ 145 (emphasis supplied)),

14  but again fails to allege how Defendant Walton's accounting was supposedly

15  "improper."[5]

16      These failures to allege any kind of duty on Defendant Walton's part leave

17  him only to speculate or guess as to what duty he had to engage or not to engage in

18  the acts and omissions that the SEC complains of.  This is plainly insufficient under

19  Rule 9(b) which requires the plaintiff to plead with particularity allegations relating

20  to fraud. *Semengen*, 780 F.2d at 731 ("Rule 9(b) ensures that allegations of fraud are

21  specific enough to give defendants notice of the particular misconduct which is

22  alleged to constitute the fraud charged so that they can defend against the charge and

23  not just deny that they have done anything wrong.") Moreover, in the absence of any

24  articulated duty, the SEC's claim against Defendant Walton boils down to the claim

25  became a signatory on Eye Machine's bank account in June or July of 2015.  (SAC

26  at ¶¶ 89, 91.)

27      [5] As discussed below, the SEC also fails to articulate how any such

28  "improper" attribution to AMC, operated as a fraud.

1  that Defendant Walton should have done more to prevent the alleged

2  misappropriation from occurring – precisely the theory that has been expressly

3  rejected by the Ninth Circuit.

4          B.  The SEC Fails to Plausibly Allege that Defendant Walton's Alleged

5              Acts and Omissions Operated or Would Operate as a Fraud Upon
Purchasers of Eye Machine's Securities

6      Other than a wholly conclusory allegation that Defendant Walton "negligently

7  engaged in transactions, practices, or courses of business which operated or would

8  operate as a fraud or deceit upon the purchaser[,]" (SAC at ¶ 146), the SEC fails to

9  allege *how* any of Defendant Walton's supposed negligent acts or omissions

10  operated or would operate as a fraud upon purchasers of Eye Machine's securities.

11      As the Supreme Court has made clear, whether a transaction, practice, or

12  course of business operates or would operate as a fraud "quite plainly focuses upon

13  the *effect* of particular conduct on members of the investing public[.]" *Aaron v. SEC*,

14  446 U.S. 680, 696-697 (1980) (original emphasis). Courts analyze whether a

15  transaction, practice, or course of business operates as a fraud or deceit under

16  Section 17(a)(3) in the same way as Rule10b-5(a) and (c). *See, e.g., SEC v. Phan*,

17  500 F.3d 895, 907-08 (9th Cir. 2007) (recognizing that Section 17(a) claims

18  generally share the same elements of claims brought pursuant to Rule 10b-5). Thus,

19  the critical inquiry is whether the conduct at issue is manipulative or deceptive. *See*

20  *SEC v. Stoker*, 865 F. Supp. 2d 457, 467 (S.D.N.Y. 2012) ("a defendant may be

21  liable under…Section 17(a)(3)…as long as the SEC alleges that the defendants

22  'undertook a deceptive scheme or course of conduct…'"); *SEC v. CKB168*

23  *Holdings, Ltd.*, 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016) ("defendants' conduct

24  created a false appearance—namely, that CKB was a legitimate company.  As a

25  pyramid scheme, CKB was nothing but a 'course of business which operates…as a

26  fraud.'"); *SEC v. Sullivan*, 68 F.Supp.3d 1367, 1377-78 (D. Colo. 2014)

27  (defendant's statements and conduct "were clearly intended to mislead the investors

28

1  and to assure [individuals] that their money was being used legitimately, and

2  undisputedly 'ha[d] the purpose and effect of creating a false appearance'").

3      Conduct is deceptive if its "principal purpose and effect" is to create "the

4  false appearance of fact[.]" *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048

5  (9th Cir. 2006), *vacated on other grounds by Simpson v. Homestore.com, Inc.*, 519

6  F.3d 1041 (9th Cir. 2008). Moreover, "[i]t is not enough that a transaction in which

7  a defendant was involved had a deceptive purpose and effect; the defendant's own

8  conduct contributing to the transaction or overall scheme must have had a deceptive

9  purpose and effect." *Id.*

10     Here, even accepting the SEC's allegations as true, as one must on a motion

11  to dismiss, the SEC fails to allege how Defendant Walton's allegedly "improper"

12  accounting or his allegedly "incorrect" attribution of payments to AMC Holdings

13  operated or would operate as a fraud upon purchasers, or had the purpose and effect

14  of creating a false appearance of fact. In fact, attributing questioned payments to

15  AMC Holdings, far from concealing or furthering misappropriation, revealed that

16  those payments were *not* for business expenses and therefore were deducted from

17  the compensation due to AMC Holdings pursuant to provisions in the PPMs.

18     As the SEC has alleged, Defendant Walton knew Eye Machine funds were

19  being used to make payments to Eva Pocklington's credit card and to Cobra

20  Chemical, and, at least with respect to the payments to Eva Pocklington's credit

21  card, knew that such payments had no legitimate business purpose and "constituted

22  'errors.'" (SAC at ¶¶ 102, 145.) Recognizing that such payments had no business

23  purpose, he attributed them as compensation to AMC Holdings, whose beneficial

24  owner is ultimately Eva Pocklington. (*See* SAC at ¶¶ 13, 20, 106.) As disclosed to

25  purchasers through the PPMs, AMC Holdings was owed a one-time management

26  administration fee equal to 7% of gross investor proceeds and up to $25,000 a

27  month consulting fee as Eye Machine's majority member. (Ex. 1 at 20; SAC at ¶

28

-14-

39.) There is no plausible way that Defendant Walton's allegedly "improper" bookkeeping (i.e., attributing the payments as compensation to AMC Holdings) operated or would operate as a fraud, or had the purpose and effect of creating a false appearance of fact when his actions actually ensured that any non-business expenditures that inured to the benefit of AMC Holdings were recorded as such and charged against the amounts owed to AMC Holdings under the PPMs.

Moreover, there is no allegation in the Second Amended Complaint that AMC Holdings received more than it was due under the PPMs, much less any allegation as to how Defendant Walton's bookkeeping in any way contributed to any such overpayment. Again, if anything, charging non-business expenditures to AMC Holdings *prevented* AMC Holdings from being overpaid because it did not allow AMC Holdings to obtain *both* its cash compensation under the PPMs *and* payment of other expenses for which AMC or its beneficiaries were responsible.

As to Defendant Walton's alleged signing of a single check to Cobra Chemical, the SEC fails to allege how this act operated or would operate as a fraud on purchasers, or how the purpose and effect of these actions and omissions created a false appearance of fact. The SEC does not allege that Defendant Walton falsely accounted for the payment to Cobra Chemical as a business expense chargeable to investors; to the contrary, the SEC alleges that he accounted for payments like this as inuring to the benefit of AMC Holdings by charging them against the amounts owed to AMC Holdings under the PPMs. (SAC at ¶ 106.)

As to Defendant Walton's failure to question payments, and failure to read the PPMs to ensure that payments comported with disclosures in the PPMs as to how investor funds would be spent, the SEC once again fails to allege how these acts and omissions operated or would operate as a fraud on purchasers, or how the purpose and effect of these actions and omissions created a false appearance of fact. As the SEC alleges, Defendant Pocklington controlled Eye Machine and directed which

payments were made from Eye Machine's bank account. (SAC at ¶¶ 8, 59-60, 91.) There is no allegation that Defendant Walton could have prevented the challenged expenditures of funds by questioning the payments, or by reading those portions of the PPMs stating how investor funds would be spent. Absent an allegation that Defendant Walton had the ability to affect whether expenditures of investor funds were made, it is implausible that Defendant Walton's alleged actions and omissions operated or would operate as a fraud, or had the purpose and effect of creating a false appearance of fact when, according to the SEC's own allegations, others authorized and directed the payments of investor funds.

Courts have refused to impose liability upon individuals under similar circumstances where the SEC has failed to allege or establish that the defendant's conduct had a deceptive purpose and effect.  For example, in *SEC v. Fraser*, No. 09-cv-0443, 2009 WL 4250508, *11-12 (D. Ariz. Aug. 11, 2009), the court granted a defendant president and chief operating officer's motion to dismiss, holding that the SEC failed to allege sufficient facts to plead scheme liability under Section 17(a), Section 10(b)/Rule 10b-5 where its claim was based on mere acquiescence in a scheme to hide uncollectable receivables resulting in an overstatement of his company's financial performance on annual Form 10-Ks:

> [T]he SEC allegations are not particular enough to plead more than Fraser's acquiescence in a scheme to hide vendor allowances. While the transactions themselves are clearly alleged to be deceptive, the SEC has not pled what aspects of Fraser's conduct had a deceptive purpose and effect in furtherance of the scheme. Fraser is not alleged to have masterminded the scheme and the SEC suggests that he effected the scheme principally by attending meetings and signing certifications. But there is no allegation or facts supporting the notion that the "principal purpose and effect" of any such actions was to create "a false appearance of fact in furtherance of the scheme," *Simpson*, 452 F.3d at 1048....

*Id.* at *11.  Similarly, in *Sullivan*, 68 F. Supp. 3d at 1378, the court rejected the SEC's contention that an accountant's act of depositing a check and withdrawing the funds as cash to assist another member of the scheme in converting money from his

-16-

1  bank account into cash to conceal it from the SEC was a deceptive act that could

2  support liability under Section 10b and Rule 10b-5(a) and (c) and Section 17(a)(3)

3  since the act, though "dishonest," did not "clearly contribute[] to the operation of the

4  underlying fraud." *Id.* at 1378.

5      Only where accountants or other individuals have engaged in affirmative

6  conduct that itself had a deceptive purpose and effect have courts upheld liability for

7  securities violations. *See, e.g., id.* at 1378-79 (accountant generated false investor

8  reports, accepted the deposits of new investors into the scheme after the SEC had

9  told the accountant to stop accepting deposits, and "solicited investments in

10  furtherance of the Ponzi scheme by insinuating that 'more money' would allow [the

11  company] to 'make more loans,' thus leading to higher investor pay-outs"); *see also*

12  *SEC v. Hughes*, 124 F.3d 449, 452, 454-55 (3d Cir. 1997) (bookkeeper acted

13  negligently under Section 17(a)(3) to further a "pump and dump" scheme when he

14  obtained cashier's checks drawing on money from the accounts of members of the

15  scheme to purchase stock prior to the inflation, transferred the proceeds after the

16  inflated stock was sold among the accounts held by those involved in the scheme,

17  and personally withdrew funds from the proceeds); *SEC v. Curshen*, 888 F. Supp. 2d

18  1299, 1307 (S.D. Fla. 2012) (accountant violated Section 10b and Rule 10b-5(a) and

19  (c) and Section 17(a)(3) when he worked together with the co-defendant

20  businessman to establish a business relationship with an asset protection company,

21  orchestrated a false media campaign, acted to convert a formerly private entity into a

22  public company, opened a brokerage account, and directed matching buy and sell

23  orders, all in furtherance of a "pump and dump" scheme to artificially inflate the

24  value of a public company's stock).

25      Here, the SEC fails to allege sufficient facts to establish that the acts or

26  omissions by Defendant Walton of which the SEC complains had the purpose and

27  effect of creating a false appearance of fact. Defendant Walton's supposedly

28

-17-

1  "improper" accounting in fact had precisely the opposite effect, ensuring that any

2  non-business expenditures that inured to the benefit of AMC Holdings were

3  recorded as such and charged against the amounts owed to AMC Holdings under the

4  PPMs. Defendant Walton's ministerial act in signing a check to Cobra Chemical

5  was not itself deceptive, and the SEC makes no allegation that Defendant Walton

6  did anything to conceal the payment or its nature or to improperly charge it to

7  investor funds, rather than AMC compensation. Defendant Walton's supposed

8  failures to question payments and failure to review the PPMs were at most mere

9  acquiescence and did not contribute in any affirmative way to the operation of any

10  alleged fraud.

11      Without alleging a nexus between Defendant Walton's alleged conduct and

12  any fraud or deceit upon investors, the SEC cannot establish a securities violation.

13  Given the SEC's failure to allege how any of Defendant Walton's acts or omissions

14  operated or would operate as a fraud, Count 3 alleging a violation of Section

15  17(a)(3) must be dismissed.

16  **II.    The Court Should Deny the SEC Leave to Amend**

17      The Court should deny the SEC a proverbial second bite at the apple and deny

18  the SEC leave to amend its Second Amended Complaint when for a second time it

19  has failed to state a claim against Defendant Walton.

20      Denial of leave to amend is generally improper where a complaint has not

21  previously been dismissed unless it is clear that the complaint could not be saved by

22  any amendment. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 403 F.3d 1050,

23  1055 (9th Cir. 2005). Where the court has dismissed a complaint once before, the

24  court has broad discretion to subsequently deny leave to amend. *Miller v. Yokohama*

25  *Tire Corp.,* 358 F.3d 616, 622 (9th Cir. 2004) ("Where the plaintiff has previously

26  filed an amended complaint, as Miller has done here, the district court's discretion to

27  deny leave to amend is 'particularly broad.' ").

28

1    Here, the Court should deny the SEC leave to amend because it is clear that

2 no amendment could save the SEC's claim against Defendant Walton, and because

3 the SEC has for a second time failed to cure the defects in its claim.

4    As the Ninth Circuit has already recognized in *Arthur Young*, an accountant is

5 neither the guarantor of his client's honesty nor an enforcement arm of the SEC. As

6 discussed above, the SEC's failure to allege what duty Defendant Walton had to act

7 or refrain from acting as he did is fatal and demonstrates that the SEC seeks to hold

8 Defendant Walton liable for not "doing more" to stop the alleged misappropriation

9 of investor funds. Because the Ninth Circuit has rejected the SEC's very theory of

10 liability for people in Defendant Walton's position, it is plain that no amendment

11 could cure the defects in the SEC's claim.

12    Similarly, the facts alleged in the SAC make clear that Defendant Walton's

13 conduct did not operate as a fraud. By the SEC's own admission, Defendant Walton

14 attributed questionable payments, such as those to Eva Pocklington's credit card, to

15 AMC Holdings, which served to prevent, not further, any misappropriation. (SAC at

16 ¶ 106.) The SEC cannot back away from that allegation in an amended pleading.  As

17 such, this Court should deny the SEC leave to amend the Second Amended

18 Complaint.

19    Even if this Court were to find that the SEC could somehow adequately allege

20 a claim under Section 17(a)(3), the Court should deny the SEC leave to amend

21 because the SEC has had ample opportunity thus far to plead a viable claim, but has

22 failed to do so. The SEC cannot be afforded endless opportunities to try to plead a

23 viable claim when responding to each of the SEC's attempts unfairly strains

24 Defendants' resources.

25

26

27

28

-19-

DEFENDANT WALTON'S MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO FED.
R. CIV. P. 12(b)(6)

## CONCLUSION

For the foregoing reasons, Defendant Walton respectfully asks this Court to dismiss the claim brought against him pursuant to Federal Rule of Civil Procedure 12(b)(6).

DATED:  October 31, 2018          JAMES & ASSOCIATES


By:        /s/ Becky S. James
          _____
          Becky S. James

          Attorneys for Defendants Peter H.
          Pocklington, Terrence J. Walton, Robert
          Vanetten, Nova Oculus Partners, LLC f/k/a
          The Eye Machine, LLC, and AMC
          Holdings LLC, and Relief Defendants Eva
          S. Pocklington, DTR Holdings, LLC,
          Cobra Chemical, LLC and Gold Star
          Resources, LLC

DEFENDANT WALTON'S MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO FED.
R. CIV. P. 12(b)(6)